McCray v. Illinois Central Railroad Co.

Gen. No. 46,981.

First District, First Division.
January 7, 1957.
Released for publication February 11, 1957.

Herbert J. Deany, Robert S. Kirby, and William F. Bunn, all of Chicago, for appellant; J. H. Wright, of Chicago, of counsel.

Michael A. Gerrard, and Schwartzberg & Barnett, both of Chicago, for appellee; Michael A. Gerrard, and Mark T. Barnett, both of Chicago, of counsel.

JUDGE BURKE delivered the opinion of the court.

Charles McCray sued the Illinois Central Railroad Company for damages under the provisions of the Federal Employers' Liability Act. A trial resulted in a verdict finding the defendant guilty and assessing damages in the sum of $36,000. Judgment was entered upon the verdict. Upon denial of the defendant's motions for judgment notwithstanding the verdict and in the alternative for a new trial, defendant appealed.

At the time of the trial plaintiff was 61 years old. In 1917 he commenced working at the Burnside Yards of the defendant, the entrance to which is located at 95th Street and Cottage Grove Avenue, Chicago. On Friday, February 9, 1951, he was employed in the capacity of a truck hand and his duties consisted in repairing and building railroad car trucks upon which sits the body of a railroad passenger car. He was then 57 years of age. After working that day until 4:30 P.M., he left the shop for home. The shop is located about two blocks from the shanty at the entranceway to the yard. When he left the shop at 4:30 P.M., he observed ice over the entire yard. From the shop to the gate he observed that the grounds of the defendant were covered with ice, which was also present on the box cars and buildings. As he was walking the two blocks to the gate he observed cinders on the road and saw men spreading cinders. These men were employees of the defendant. While walking from the shop to the gate he was able to see where he was walking. When he reached the shanty at the gate and entranceway to the defendant's premises he observed ice over the entire sidewalk where it begins at the gate and the presence of this ice continued on the sidewalk all the way down to 95th Street. He observed ice on the road adjacent to and parallel with the sidewalk. Cinders were spread all over the ice on the road. The road and sidewalk are on the defendant's premises. Cottage Grove Avenue

runs in a northerly and southerly direction. The roadway and walk from the Burnside Yards run northerly to where 95th Street and Cottage Grove Avenue intersect. The road and sidewalk run in a northerly direction from the gate. They are the only method of ingress or egress to the yard. The road is just east of the sidewalk.

As he passed through the gate he observed the crossing gate to be up. He testified that as he was walking through the gate he saw ice all over the sidewalk and no cinders. As he continued walking down the sidewalk he saw no cinders there. He fell on the sidewalk after walking on it about 15 feet. He knew that the area just to the west, adjacent to and parallel with the sidewalk was made up of cinders. He said that although the sidewalk was covered with ice down to 95th Street he did not fall again; that there was no salt on the sidewalk; and that he could see the ice as he was looking down all the time. He did not examine the area where he fell. He testified that there were no cinders on the sidewalk that he observed as he was coming to work in the morning but that he did not fall that morning. He had never, prior to 1951, fallen on this sidewalk nor, as he was walking down the sidewalk on February 9, 1951, did he see any other man fall on the sidewalk. On February 9, 1951, he saw no cinders or ashes on the walk. In the eight years prior to 1951, he testified that in icy weather the defendant would put cinders on the sidewalk after first putting cinders on the road because the cars and trucks had to come up the road bringing materials to the storehouse buildings. Prior to 1951, in icy weather, plaintiff testified that when going to work in the morning he would see cinders on the sidewalk if the men had been spreading cinders long enough to have first fixed the road. He testified that there was so much ice because it rained on February 9, 1951; that there was ice before

429

he went to work; that about noon it commenced raining and then freezing weather set in; and that after it rained the men started to put down cinders. A weather bureau report introduced by the plaintiff reveals that the temperature had been extremely cold; that on February 6, 1951 there was .44 inches of water and 3.8 inches of snow. Some snow, but very little, fell thereafter until the 9th. The temperatures were extremely cold on February 7, 8 and 9th. He saw no cinders or ashes on the walk.

Dominic Taglioli, called by plaintiff, testified that he was employed by the defendant at the Burnside Yards; that he knew the plaintiff; that he saw plaintiff as the latter was going home from work on February 9, 1951, which was a cold day; that there was snow on the ground with cinders scattered on the walk and the road; that the road and walk were icy, had snow and were slippery in certain spots; that the only way into and out of the Burnside Yards is the entranceway at Cottage Grove Avenue and 95th Street; that the one sidewalk leading out of the yards is about 4 feet wide; and that its condition as he was leaving consisted of snow and cinders with here and there a few icy spots. He stated that plaintiff fell down and that he, the witness, assisted him to his feet. At that time the witness was accompanied by his brother-in-law, Frank Crocilla. On cross-examination, the witness testified that he reached the gate at approximately 4:45 P.M.; that plaintiff was 10 or 15 feet ahead of him and was walking with a limp; that the cinders he observed on the sidewalk were scattered and continued from the top of the gate all the way down to 95th Street; that cinders had been scattered on the roadway from the truck shop to the gate and were in the street; and that they had been placed there earlier that morning as he had observed them as he went to work. He testified further that he had no difficulty in seeing where he

430

was going and he could distinguish between the cinders, the ice and the snow.

Frank Crocilla testified that he was employed as a blacksmith's welder by the defendant at the Burnside Yards; that he worked in the same department with plaintiff; and that he left work about 4:30 P.M. and while it was dark, he could see where he was going. He identified an exhibit showing a picture of the sidewalk leading out of the yards and testified that it was the only way you could get into or out of the yards, that the sidewalk on February 9, 1951, was icy and slippery although he walked on the sidewalk all right. He testified on direct examination that he did not remember whether the sidewalk had any cinders or sand on it as he was walking down. As he left the shop, walked to the north gate and started down the sidewalk he had no trouble seeing where he was going.

Espard Brown, called by plaintiff, testified that his occupation was that of a welder for the defendant at the Burnside Yards; that he was working there on February 9, 1951; that he quit work at 4:30 P.M. and rode in an automobile from the shop past the sidewalk leading out of the premises and down to 95th Street. He did not see the mishap but testified that he paid attention to the sidewalk they were coming down and that it was quite slippery. On cross-examination he said he and two other men were riding from the truck shop to Cottage Grove Avenue in an automobile and that during this ride he did not see any cinders on the road or around the gate as he was not looking for them; and that as he came down the road he was not looking over on the sidewalk and does not know the condition of the sidewalk as it existed on February 9, 1951.

John Bartus testified for the defendant that he began working for the defendant on June 4, 1906 at the Burnside Shops; that on February 9, 1951, he was a foreman in the store department; that it was his duty to keep

431

the road, sidewalk and entranceway to the Burnside Shops clear in the winter; that in case of a big snow a snowplow was used on the roads and sidewalk; that if they were icy, cinders or salt were spread; that the manner of spreading the cinders or salt consisted of the use of vehicles and men who would come down on the east side of the entranceway to the yards, spreading cinders on the east half of the roadway and then return to the shanty spreading cinders on the west half of the roadway and the sidewalk. He said that no records were kept as to the date cinders were put down. Henry Washington, a witness for the defendant, testified that he was employed by the defendant as a truck hand at the Burnside Shops; that he knew and worked with the plaintiff since 1922; that he observed the plaintiff walking with a limp from 1948 to 1950; that plaintiff's use of a sledge hammer was restricted; and that plaintiff complained to him about pains in the joints. He did not witness the accident.

Following his mishap on Friday the plaintiff went home on the streetcar. He took a bath and the leg "felt sore." After dinner he went to bed and "an awful pain hit" his right leg. He "stayed around the house until Monday" and "figured" that by Monday the pain would be less. He said that it got worse and that he went to the Illinois Central Hospital on Monday, February 12. At the hospital he reported that he fell and hit the leg. He remained at the hospital until February 21. There was testimony as to the medical treatment he received from then until the trial. There was evidence that prior to February 9, 1951, he had been suffering from arthritis which affected both of his legs. Physicians testified in support of the respective positions of the parties as to the physical condition of the plaintiff.

■ ■ The defendant asserts that there was no substantial evidence of negligence presented to submit that

question to the jury. In Urie v. Thompson, 337 U. S. 162, the court said (182) that "We recognize, with respondent, that the Federal Employers' Liability Act is founded on common law concepts of negligence and injury, subject to such qualifications as Congress has imported into those terms." Plaintiff insists that he established negligence on the part of the defendant by substantial and competent evidence. The defendant cites cases involving allegations of negligence caused by the accumulation of ice and snow. The cases cited by both parties cannot be understood without a recitation of the factual situation in each case. The defendant owed to its employees the duty of providing a reasonably safe place for the carrying on of their work and of ingress and egress to that place. The sidewalk was the proper place for the plaintiff to walk while leaving the yard. There was evidence that no cinders or ashes were spread on the walk. He was walking on the sidewalk when he fell. The sidewalk was the method of egress provided by the defendant for the use of pedestrians. The temperatures had been extremely cold since February 6, 1951. There was ice on the sidewalk in the morning when plaintiff went to work. It rained just before noon. After it rained employees of the defendant started to spread the cinders. Plaintiff testified, "I guess it was 14 below that day." There was testimony that the cinders were also spread on the walk. In our opinion the court was right in submitting the issue of negligence to the jury. The defendant had notice of the condition of the walk. In view of the fact that all of the employees were required to leave the defendant's premises by way of that exit, the jurors, acting as reasonable men and women, would have the right to say that the failure to spread cinders or other material on the walk constituted negligence. We cannot agree with the statement in some of the cases that to allow recovery would either require the

railroad company to cease operation when there was ice or to compensate everyone who might be injured. It would not be unreasonable to require the railroad to spread cinders or other material within a reasonable time after the icy condition became apparent.

Defendant asserts that the sole proximate cause of plaintiff's fall was his own gross lack of care, pointing out that he was familiar with the area about the entrance to the premises; that as he walked he was able to see where he was walking; that he saw cinders spread all over the ice on the road to the right of him; that he knew the ground to the left of the sidewalk was made up of cinders; and that he saw the ice all over the sidewalk. Defendant points out that plaintiff voluntarily and knowingly took the one way fraught with danger and risk of injury to himself, although the risk of injury was obvious and such that a man of ordinary prudence would have avoided. Our remarks on the question of liability apply with equal force to this point. The road was used primarily for vehicular traffic. It is interesting to note that other employees also used the walk. We cannot say that the jury acted unreasonable in rejecting defendant's theory that the sole proximate cause of plaintiff's fall was his own gross lack of care.

Defendant maintains that the court erred in allowing plaintiff to contradict and impeach his witness, Dominic Taglioli. On direct examination the witness testified that there were present on the sidewalk snow and cinders with a few small icy spots here and there. On cross-examination, the witness admitted observing cinders on the sidewalk as he went to work the morning of February 9, 1951. This testimony was consistent with his testimony on direct examination. On redirect examination, under the claim of surprise and for the ostensible purpose of awakening the witness's conscience, and over the objections of the defend-

ant, the court permitted the witness to be impeached and contradicted by use of an alleged prior inconsistent written statement. As a general rule, a party to a lawsuit voluntarily calling a witness to the stand vouches for his credibility and cannot impeach him except as that result may be incidentally accomplished by proving a state of facts differing from that sworn to by the witness. People v. Michaels, 335 Ill. 590; Chicago City Railway Co. v. Gregory, 221 Ill. 591. If a party's witness unexpectedly gives surprising testimony at variance with an earlier statement, the party calling the witness has the right to call the attention of the witness to such statement for the purpose of refreshing his memory or awakening his conscience. Finch Bros. v. Betz, 134 Ill. App. 471; People v. Rongetti, 344 Ill. 278, 284; People v. Quevreaux, 407 Ill. 176. In People v. Michaels, 335 Ill. 590, the court said (592):

"The rule is, that when a witness unexpectedly gives testimony against the party calling him, such party has the right to examine him and by such examination show that the witness is giving unexpected testimony, and to specifically call the attention of the witness to former statements made by him for the purpose of refreshing his memory or awakening his conscience and cause him to relent and speak the truth if he was lying. If, however, the witness denies the alleged statements the party calling him must be concluded by his answers, and cannot show, either by the written statements of the witness or by other witnesses, that the witness did, in fact, make those statements, either for the purpose of impeachment or as original evidence of the facts sought to be proved. He may, however, prove by other witnesses the facts sought to be proved by the witness giving such unexpected testimony."

The plaintiff had concluded his direct examination of Taglioli wherein the alleged damaging testimony was

contained. He did not attempt to claim surprise until the completion of the cross-examination. It is apparent that plaintiff did not consider himself surprised by the testimony of the witness as to the presence of the cinders at the conclusion of the direct examination. We are of the opinion that the court erred in allowing the plaintiff to contradict and impeach Taglioli.

Espard Brown, a witness called by the plaintiff, testified that on leaving work on February 9, 1951, he had occasion to go past the shanty and sidewalk leading out of the premises and that he paid attention to this sidewalk as he was coming down and out of the premises and that it was quite slippery. Thereupon counsel for the plaintiff commenced questioning the witness concerning a statement given by him to counsel in February, 1954, and a conversation the witness had with counsel on the night before he testified. Plaintiff's counsel, claiming surprise at the answer of the witness concerning the sidewalk, asked permission to show that there was another written and oral statement made to him in this matter. Following additional questioning of the witness concerning the authenticity of the written statement, plaintiff's counsel was permitted to ask the witness whether or not the statement refreshed the witness's recollection as to the condition of the sidewalk. There was no foundation to the claim that the witness needed his recollection refreshed. He had testified concerning the condition of the sidewalk. There was no inconsistency between the testimony given by the witness before the claim of surprise and the testimony given by the witness in response to questions based upon the alleged impeaching written statement. When a witness merely fails, when called, to testify in favor of the party calling him, as he was expected to do, but says nothing which tends to aid the case of the adversary party, he cannot be cross-examined or impeached by the party who calls him. See

436

Randazzo v. United States, 300 F. 794; Marugg v. Kells, 146 Ill. App. 394. We find that the court erred in allowing Brown to be examined by the plaintiff concerning his alleged inconsistent written statement.

 The defendant says that the trial court abused its discretion in unduly restricting defendant's right of cross-examination of the plaintiff's medical witnesses. The plaintiff had been examined and treated by the physicians who were in the employ of the defendant, and it was only from their testimony that his condition, history and treatment received at the time of his injury could be put into the record and described to the jury. The latitude to be allowed in cross-examination rests largely within the discretion of the court. We cannot say that the discretion was abused.

 The defendant complains that the court erred in giving plaintiff's instruction P—1. This instruction, in effect, informed the jury that if they found the facts set out in the instruction, the finding of such facts constituted negligence as a matter of law. In so doing the court invaded the province of the jury. On a retrial the instruction should be modified so as to remove that objection. The defendant states that the court committed reversible error in giving plaintiff's instruction P—8 and in refusing to give defendant's tendered instruction D—12. The given instruction tells the jury to award damages for future losses without restricting such future losses to their "present value." The tendered instruction, D—12, reads:

"The award of damages for loss of future earnings, if any, must be reduced to its present cash value and adequate allowance must be made for the earning power of money, and future earnings should be calculated on the length of time the plaintiff would expect to be employed rather than on the time he would expect to live. You are entitled to consider all factors or cir-

cumstances such as illness, retirement either compulsory or voluntary, the nature and hazards of the employment of the plaintiff, accidents, the possibility of obtaining other suitable employment, death, or other like matters which might tend to increase or decrease the pecuniary loss."

In Chesapeake & Ohio Ry. Co. v. Kelly, 241 U. S. 485, the court said: ". . . the question of the proper measure of damages is inseparably connected with the right of action, and in cases arising under the Federal Employers' Liability Act it must be settled according to general principles of law administered in the Federal Courts." Any damages for future loss of earnings must be reduced to their "present value." See Southern Pacific Co. v. Gastelum, 297 P. 875; Gulf, Colorado & Santa Fe Ry. Co. v. Moser, 275 U. S. 133; Thompson v. Camp, 163 F.2d 396; Kennedy v. Ross, 213 Ill. App. 446; Allendorf v. Elgin, Joliet & Eastern R. Co., 8 Ill. 2d 164. The defendant does not contend that elements of damage, such as pain and suffering, physical disfigurement, etc., must be reduced to present values, and concedes that the decisions point out that reduction is not required except with regard to future loss of earnings. Plaintiff states that the defendant could have introduced mortality and actuarial tables. It was not incumbent on the defendant to introduce evidence of plaintiff's damages. Plaintiff states that the case was tried five years after the occurrence and that at that time the jury could find from the evidence that he had suffered the loss of $18,000 in earnings, and that by their verdict the jury awarded the plaintiff what amounted to an additional five years' pay. Plaintiff overlooks that the jury were required to consider what mitigating effect, if any, to give to contributory negligence, as required by federal law, and that a jury is not allowed to assess future loss of earnings to the date a man may die rather than on how long they feel

438

he may reasonably have been expected to work in the future. We agree with defendant that the court committed reversible error in giving instruction P—8 and in refusing to give defendant's instruction D—12.

The defendant argues that the court erred in giving plaintiff's instruction P—10. We agree that the court erred in giving this instruction. Certain language therein authorized a recovery generally without limiting the negligence to that charge in the complaint. There was no error in refusing to give defendant's instruction D—13. The subject matter of the instruction was covered by defendant's given instruction D—14.

For the reasons stated the judgment of the Superior Court of Cook county is reversed and the cause is remanded for a new trial.

Judgment reversed and cause remanded for a new trial.

NIEMEYER, P. J. and FRIEND, J., concur.