The People of the State of Illinois, Plaintiff-Appellee, *v.* Wilbert Lipscomb, Defendant-Appellant.

(No. 57439;

First District (5th Division)—April 11, 1974.

116

Paul Bradley, Deputy Defender, of Chicago (James R. Streicker, Assistant Appellate Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (James S. Veldman, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Tried by a jury, defendant was found guilty of the murder and armed robbery of Jerome Wells and the attempt murder of Richard White. Defendant was sentenced to terms of 100 to 150 years for murder, 10 to 20 years for armed robbery and 10 to 20 years for attempt murder, the sentences to be served concurrently.

On appeal defendant contends that (1) the evidence was not sufficient to prove him guilty beyond a reasonable doubt; (2) he was denied his right to confront witnesses against him due to the trial court's restriction of the cross-examination of the State's principal witness; (3) the trial court erred in permitting a ballistics expert to testify regarding tests run on a revolver which had been destroyed prior to trial; (4) the trial court erred in permitting defendant's sister to be called as the court's witness and that this error was compounded by the admission of hearsay evidence under the guise of impeachment; (5) a photograph of the deceased's body should not have been admitted into evidence; (6) the State's closing argument was improper; (7) since his convictions for the armed robbery and murder of Jerome Wells resulted from the same conduct, the conviction and sentence for armed robbery must be reversed; and (8) the sentence of 100 to 150 years for murder is excessive.

Richard White testified for the State that on the afternoon of August 10 he was working in the K & W Hardware Store. At approximately 3 P.M. a man wearing a yellow banlon shirt entered the store accompanied by a second shorter individual. The man wearing the yellow shirt asked Jerome Wells, the owner of the store, for an article not carried by the store. The two men "took a look around" and walked out. The two men subsequently reentered the store. They again looked around

and walked out. White was able to observe them for about 2 minutes. Shortly thereafter, these men entered the store a third time. There was now a third individual outside the store peering in through a window. White walked to the front of the store, locked the door and then walked over to a merchandise counter. The man wearing the yellow shirt was standing in an aisle next to Wells. White walked toward them, past the shorter man. As he came upon the individual standing beside Wells, the man "turned around instantly and shot [him]." The man was holding two guns, one with a long (4 to 6 inches) silver barrel, the other a darker snub-nosed model. White was 2 or 3 feet from the man when he was shot. Although the man was wearing blue-tinted sunglasses when he entered the store the third time, he was not wearing them when he shot White. Upon being shot, White fell to the floor. The shorter man stood over him and ordered him not to move. While on the floor he heard one shot followed by several others. He heard a thud next to him and then the sound of the cash register ringing, indicating that the cash drawer had been opened. This was followed by the sound of trampling feet and then the sound of the front door closing.

After the intruders had fled, he got up and touched Wells. He then called the police. He struggled to the street in an attempt to get help, collapsed and was taken to the hospital. There, during the days following the incident, the police showed him photographs from which he identified defendant as the man who shot him. On a separate occasion he identified a photo of defendant's brother, Carl Lipscomb, as being the shorter man who participated in the robbery. Prior to the robbery there had been about $60 in cash and a check, dated August 10, 1970, made out to K & W Hardware in the cash register.

White was a student at Elmhurst College. He had worked "off and on" for 1 year in the State's Attorney's office. On cross-examination White testified that he worked in the investigative section of the State's Attorney's special prosecutions unit. At the time of trial, however, he was no longer employed by the State's Attorney.

The testimony of the State's expert witnesses indicates that White's wound was caused by a .38-caliber weapon and that Wells' wounds were caused by both a .38-caliber weapon and a .22-caliber weapon.

Willie Jones, Sr., testified for the State that on August 10, 1970, at approximately 3 P.M. he was working at the rear of an automobile supplies store located at 201 North Cicero Avenue. He saw three young men running toward him from the south. He identified one of the men as Carl Lipscomb, his next-door neighbor. Although he didn't know their names, he had seen the other two youths in the neighborhood. He described the taller of them as wearing a yellow shirt. He did not believe

this man to be defendant; however, he didn't "know what his face looked like now because [he] didn't pay any attention to it."

Willie Jones, Jr., 13 years of age, was qualified as a witness for the State: At approximately 3 o'clock on August 10, 1970, he was in his home located at 206 North LaCrosse with his brother and sister. They were watching television. He looked out the window and saw his next-door neighbors, defendant and Carl Lipscomb, running to their home. Defendant was wearing an orange nylon shirt.

Robert Shanahan, a homicide investigator for the Chicago Police Department, testified for the State that at approximately 3:30 P.M. on the date in question, he received an assignment to go to the K & W Hardware Store. Upon arriving at the store he observed the body of the deceased. About 20 minutes later, during the course of his investigation, he spoke with Willie Jones, Sr., at the auto supply shop. Acting on information given him by Jones, he proceeded to the Lipscomb apartment at 204 North LaCrosse. He was accompanied by three other police officers. Through a back-porch window he was able to see a check lying on a table. One of the officers climbed through a window and unlocked the porch door for Shanahan. Upon gaining entry to the apartment he found a .22-caliber revolver, a .38-caliber revolver with a blue steel barrel, four spent .38-caliber shell casings and the check which was dated August 10, 1970, and made payable to "K & W Hardware."

Detective Robert Smitka testified for the State that on August 11, 1970, he interviewed Richard White in the Garfield Park Community Hospital. During the course of the interview he showed White a group of six photographs. White picked out a photo of defendant as the man who shot him. White was heavily sedated when he was asked to make this identification.

Patrolman Arthell Goodwin testified for the State that at approximately 12:45 A.M. on September 8, 1970, he observed a group of seven or eight young people standing on the street. He approached the group to ascertain whether they were in violation of the curfew then in effect. Two of the youths began to walk away. When Goodwin ordered them to stop, he noticed a bulge shaped like the handle of a revolver under the T-shirt of one of them. Upon searching him, he discovered a .22-caliber revolver with a 6-inch chrome finished barrel. The youth was placed under arrest. Goodwin identified him as defendant.

The State called Laura Lipscomb, defendant's sister, to testify. When she denied any remembrance of having seen defendant on the evening of August 10, 1970, she was declared a hostile witness. On cross-examination by the State she testified that she remembered being interviewed by Investigators Rinaldi and Corbett but could not remember telling

them that she had seen defendant following the crimes at which time defendant told her that he had been wounded. Rinaldi and Corbett were then called. They testified that Ms. Lipscomb had told them that her brother had been shot in the hand.

Claude Bridges, a record clerk at the Cook County Jail, testified for the State that the medical intake sheet of defendant, dated September 8, 1970, indicates that there was a scar on his left index finger.

Homicide Investigator Clyde Craig testified for the State that at approximately 3:20 P.M. on August 10, 1970, he received an assignment to go to 159 North Cicero Avenue. When he entered the hardware store located at that address, he discovered a pair of sunglasses. About 10 feet beyond the glasses lay the body of Jerome Wells. There was a cash register located about 10 feet from Wells' body. There were drops of blood on the cash register and on a dollar bill which was lying beneath it. Craig saw no blood between Wells' body and the cash register. When he arrested Carl Lipscomb later that afternoon, he observed no injuries to his hands or fingers. He noted that Carl Lipscomb is about 5 inches shorter than defendant.

Donald Smith testified for the State that he was assigned to the Criminalistics Division of the Chicago Police Department and that his duties consisted of receiving and examining evidence to determine if it had been used in the commission of any offenses. It was his opinion that the .38-caliber bullets recovered from White and the body of Wells were fired by the .38-caliber revolver found in the Lipscomb apartment. The .22-caliber gun recovered from the apartment was a starter pistol and was incapable of firing bullets. The .22-caliber revolver seized when defendant was arrested was also tested. Although a positive determination that this was the same gun used in the shooting of Jerome Wells could not be made, it did have the same "class characteristics" as the weapon which fired the bullets recovered from the body of the deceased. This gun, which had been inventoried by the police department under a number different than that assigned the case at bar, was destroyed prior to trial.

Defendant chose not to testify on his own behalf.

OPINION

Defendant contends that he was not proven guilty beyond a reasonable doubt. We disagree.

■■ Richard White testified that on the afternoon of the crime, on three separate occasions, defendant and his brother, Carl Lipscomb, entered the hardware store. White had opportunities to observe defendant for periods of up to 2 minutes in length from distances as close as 2 or 3 feet. White was able to describe in detail the clothes worn by

defendant, the types of guns he was carrying and the difference in physical stature between defendant and his brother. We note that only one day after the holdup White positively identified defendant as the gunman from among several police photographs shown to him. It is the function of the trier of fact to determine the credibility of witnesses, and its finding of guilty will be disturbed only where the evidence is so unsatisfactory as to leave a reasonable doubt as to the defendant's guilt. The testimony of even a single witness is sufficient to convict if it is positive and the witness credible. (*People v. Hampton*, 44 Ill.2d 41, 45, 253 N.E.2d 385.) Clearly, under this well established standard, the testimony of White is sufficient to sustain defendant's conviction.

Moreover, the State has bolstered its case with the corroborative testimony of several other witnesses. Willie Jones, Sr., testified that he saw three young men run past him down the alley away from the hardware store. One of these men he identified as Carl Lipscomb. Although his attention was not drawn to the faces of the other two men, he described the taller of them as wearing a yellow shirt; White testified that defendant was wearing a yellow banlon shirt. Willie Jones, Jr., testified that he saw defendant and his brother run into the Lipscomb apartment next door to his home and then leave a short time later. He described defendant as wearing an orange nylon shirt. A .38-caliber blue steel revolver recovered from the Lipscomb apartment was one of the weapons used in the shooting of White and Wells; a long-barrelled chrome-plated .22-caliber revolver, seized from defendant when he was arrested, bore the same class characteristics as the weapon that fired several of the bullets recovered from Wells' body. White testified that defendant carried a dark, snub-nosed gun and a "silver" gun with a longer barrel. Homicide Investigator Craig testified that defendant is 5 inches taller than Carl Lipscomb. White described defendant as being the taller of the two holdup men. On the basis of this record defendant was proven guilty beyond a reasonable doubt. *People v. Hampton*, 44 Ill.2d 41, 253 N.E.2d 385.

Defendant next contends that the court below improperly restricted his cross-examination of White concerning White's employment by the Cook County State's Attorney. He argues that his interrogation of this key witness was so curtailed that he could not establish his possible bias. See *People v. Soto*, 64 Ill.App.2d 94, 212 N.E.2d 353.

██ We agree with defendant that the right of cross-examination is the core of the sixth amendment right of confrontation (*Pointer v. Texas*, 380 U.S. 400) and, accordingly, reasonable latitude must be given a cross-examiner to guarantee the fairness of the criminal justice process. (*Smith v. Illinois*, 390 U.S. 129; *Alford v. United States*, 282

U.S. 687.) We note, however, that the determination of what constitutes "reasonable latitude" lies within the sound discretion of the trial court, and only in a case of clear abuse of this discretion resulting in manifest prejudice to defendant will a reviewing court interfere. (*People v. Gallo*, 54 Ill.2d 343, 297 N.E.2d 569; *People v. Nugara*, 39 Ill.2d 482, 236 N.E.2d 693; *People v. Halteman*, 10 Ill.2d 74, 139 N.E.2d 286.) In the instant case defense counsel was able to question White regarding the duration of his employment by the State's Attorney, the unit of the State's Attorney's office in which he worked, the identity of his supervisors there, the extent of his participation in the State's Attorney's activities directed against the Black Panthers and west side street gangs, and the fact that his duties included undercover assignments. In view of this extensive interrogation of White we believe that the fact that further questioning was not allowed on this matter did not constitute an abuse of discretion by the court below.

It is also contended that defendant was denied his right to confront witnesses against him when a ballistics expert was permitted to testify regarding tests he had run on a .22-caliber revolver which had been destroyed by the police prior to trial. The weapon in question was seized from defendant when he was arrested for an unrelated offense and filed under a number different from that assigned to the instant case. Donald Smith, a police department firearms examiner, testified that subsequent to his testing of the weapon, it had been destroyed. While we do not condone the inadvertent destruction of evidence by the State, we believe that defendant was not so severely prejudiced as to necessitate reversal of his conviction. Smith stated that he could not reach a positive conclusion that this .22-caliber revolver was the weapon used in the shooting of Jerome Wells; rather, it could only be determined that this gun had the same class characteristics as the one used in the Wells' murder. Defendant was given full opportunity to question Smith as to his qualifications and the test procedures he used to reach his conclusions. Although it cannot be denied that the destruction of the gun precluded defendant from conducting his own tests, the record before us is bare of any request by him for its production for this purpose. In view of the overall strength of the case against defendant we find that the admission of Smith's testimony was harmless beyond a reasonable doubt. *People v. Gill*, 54 Ill.2d 357, 297 N.E.2d 135; see also *Chapman v. California*, 386 U.S. 18.

The State attempted to prove that the source of the blood found on the cash register and on the currency lying beneath it was from a hand injury incurred by defendant during the course of the robbery and not from the wounds suffered by the deceased. A photograph of Wells' body

was introduced purporting to demonstrate that his wounds could not possibly have caused the bloodstains. There was no direct evidence that defendant was wounded during the holdup and therefore the admission of this photograph was improper. (*Cf. People v. Speck,* 41 Ill.2d 177, 242 N.E.2d 208; *People v. Jenko,* 410 Ill.478, 102 N.E.2d 783.) However, in view of the overwhelming weight of the State's corroborated eyewitness evidence, we consider this to be harmless error beyond a reasonable doubt. *Chapman v. California; People v. Gill.*

The State claims that there was evidence that defendant was wounded during the incident. The State called Laura Lipscomb, a sister of defendant, to testify to a conversation she allegedly had with him on August 10, 1970, concerning his freshly bandaged hand. When examined by the State, Ms. Lipscomb claimed she could not remember the August 10 conversation with her brother. Thereupon the court declared her to be a hostile witness. When cross-examined by the State, she remembered being interviewed by police officers but could not recollect what she had told them. The State then called Detectives Corbett and Rinaldi, ostensibly for purposes of impeachment. They related that Ms. Lipscomb told them of an August 10 conversation with defendant concerning a hand wound which he claimed was caused by a stray bullet.

Defendant asserts that the court below erred in declaring Ms. Lipscomb a hostile witness and that this error was compounded by the admission of the hearsay testimony of the police officers in the guise of impeachment.

■■ Supreme Court Rule 238 (Ill. Rev. Stat. 1971, ch. 110A, par. 238) provides that a hostile witness can be questioned by the party calling him as if he were under cross-examination. A determination of this nature is clearly within the sound discretion of the trial court. (See *People v. Siciliano,* 4 Ill.2d 581, 123 N.E.2d 725.) However, a witness thus declared hostile may be asked leading questions solely for the purpose of refreshing his recollection and not for impeachment. (*People v. Gallery,* 336 Ill. 580, 168 N.E. 650.) Where, as in the instant case, the witness continues to claim a lapse of memory but says nothing which tends to aid defendant, she cannot be impeached by the State. (*Cf. McCray v. Illinois Central Railroad Co.,* 12 Ill.App.2d 425, 139 N.E.2d 817.) We find, however, that this error was also harmless beyond a reasonable doubt under *Chapman v. California.*

Defendant next contends that the State's closing argument was improper in that it implied that defendant's friends and relatives engaged in witness intimidation. Having examined the record, we can find no such implication in the State's argument.

■■ Grounding his assertion on section 1—7(m) of the Criminal

Code (Ill. Rev. Stat. 1971, ch. 38, par. 1—7(m)),* defendant contends that since his convictions for the armed robbery and murder of Jerome Wells resulted from the same conduct, the conviction and sentence for armed robbery must be reversed. In *People v. Johnson,* 44 Ill.2d 463, 256 N.E.2d 343, the Supreme Court provided us with the relevant standard for applying this statutory provision to the facts of a particular case. There it was held at page 475:

> "However proper the application of the * * * statutory provisions may be in cases which would involve double punishment for the same conduct where the same identical evidence is the basis for the finding of guilty of both charges, we believe they were not intended to cover situations in which more than one offense arises from a series of closely related acts and the crimes are clearly distinct and require different elements of proof."

Viewing the record of the instant case we find that the murder and armed robbery were, in fact, founded upon wholly separate and distinct criminal acts performed by defendant. After wounding White, defendant proceeded to shoot Wells nine times. Only after Wells had fallen to the floor, fatally wounded, did defendant open the cash register. At this point the second criminal act, armed robbery, was committed. The conviction and sentencing of defendant for these two crimes was, therefore, proper.

■■ Finally, defendant argues that the imposition of a sentence of from 100 to 150 years for the murder of Wells was excessive. It is left to the discretion of the trial court to fix punishment. (*People v. Schmidt,* 10 Ill.2d 221, 139 N.E.2d 726.) Taking cognizance of the lower court's superior position to make a sound determination as to sentencing, we are reluctant to interfere unless the sentence falls without the limitations set by statute or manifests a substantial departure from the spirit of our constitution. (*Cf. People v. Bricker,* 131 Ill.App.2d 917, 267 N.E.2d 761; see generally Ill. Const., art. I, sec. 11.) In view of the extreme brutality of this crime, we do not feel that the court below abused its discretion in sentencing defendant to a term of from 100 to 150 years for the crime of murder.

For the foregoing reasons the judgment entered below is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.

---

* Ill. Rev. Stat. 1971, ch. 38, par. 1—7(m) states:

"(m) Consecutive and Concurrent Sentences.

When a person shall have been convicted of 2 or more offenses which did not result from the same conduct, either before or after sentence has been pronounced upon him for either, the court in its discretion may order that the term of imprisonment upon any one of the convictions may commence at the expiration of the term of imprisonment upon any other of the offenses."