THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES FLOYD COLE, Defendant-Appellant.

Fifth District   No. 76-59

Opinion filed May 17, 1977.—Rehearing allowed and opinion modified July 8, 1977.

134

Michael J. Rosborough, of State Appellate Defender's Office, of Mt. Vernon, and Theodore A. Gottfried, of State Appellate Defender's Office, of Springfield, for appellant.

William Kelly, State's Attorney, of Vandalia (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. PRESIDING JUSTICE CARTER delivered the opinion of the court:

Following a jury trial, defendant James Cole was found guilty of two counts of murder, two counts of concealment of homicidal death, and one count of obstruction of justice. The court sentenced him to 14 to 28 years on each count of murder, from two to six years on each count of concealment of a homicidal death, and from one to three years for obstruction of justice, all sentences to run concurrently.

On appeal, defendant presents the following issues for review:

1. Whether his Sixth Amendment right to compulsory process was denied by virtue of the trial court's ruling, on the State's motion, precluding defendant from calling his two co-defendants to testify;

2. Whether the State failed to establish beyond a reasonable doubt that defendant was accountable for the murders of Larry Murray and Danny Cade or for the concealment of these homicides, and further failed to establish that obstruction of justice had been committed;

3. Whether the prosecutor's closing argument was improper and prejudicial because:

   (a) he shifted the burden of proof to defendant by improperly commenting upon the defendant's failure to introduce into the evidence statements made by two other defendants who were being tried separately—thereby creating the impression that these statements could have been introduced—and, by improperly and inaccurately suggesting to the jury that they could infer these statements would be adverse to defendant;

   (b) he misstated the law of accountability in saying that mere

presence and failure to act was sufficient to find defendant accountable;

4. Whether the trial court erred in refusing to give the jury the second paragraph of the Illinois Pattern Jury Instructions (IPI), Criminal, No. 3.02, pertaining to circumstantial evidence, where the proof of guilt was entirely circumstantial;

5. Whether the trial court erred in giving seven specific guilty verdict forms and only one general not guilty form.

On the afternoon of July 15, 1975, two fishermen discovered two bodies floating in the Kaskaskia River. The bodies were wired together and secured to a concrete block. Advanced decomposition precluded visual identification of the bodies. Upon a dental examination, however, the victims were identified as Larry Murray and Danny Otto Cade. Autopsies revealed the cause of death to be multiple, severe blows to the head with a blunt, hard instrument. The jaw bones of each victim had been broken into several pieces.

The fatal beatings occurred at the Schenker farm southeast of Vandalia, Illinois, during the early morning hours of July 11, 1975. The decedents suffered death when they were bludgeoned, their clothing searched and then their bodies were put into the trunk of a car. The evidence indicates that the victims remained alive in the trunk for a short time. The bodies were later deposited in the Kaskaskia River.

There is no dispute that defendant was present when the fatal blows were administered. Nor was it disputed that afterwards he drove Larry Murray's car away from the Schenker farm to a spot on old Route 51, south of Centralia. There he abandoned the car, with the keys in the ignition. The car was left unlocked on the edge of the highway where the police discovered it two hours later.

The events leading up to the killings and disposal of the bodies were as follows. One Michael Davis, decedent Larry Murray and defendant were all involved in illegal drug activities. Larry Murray was Michael Davis' supplier for drugs that Davis sold in the Vandalia, Salem, and Centralia areas. In turn, defendant, who had lived in both Salem and Centralia, helped Davis sell marijuana and THC, a controlled substance, in these areas in exchange for which he was supplied with drugs for his personal use. Defendant testified that during June and July of 1975 he had been using marijuana and THC.

During the three days before the killings defendant spent much time in the company of Davis and Allan Richards. On Tuesday, July 8, defendant and his brother, Buiel, visited Michael Davis' trailer. The brothers returned to the trailer later and spent the night there. The evidence shows that they were supplied with all the marijuana they wanted during that afternoon and evening. The next morning the brothers separated.

Defendant hitch-hiked to Ron Lambert's house in Patoka. There he obtained four bags of marijuana. Later he hitch-hiked to Fairview Park in Centralia where he met his brother at about 1:30 in the afternoon. Defendant and his brother remained together the remainder of the afternoon and early evening, returning home about eight or nine o'clock.

The evidence is unclear whether defendant spent the early morning hours of Thursday, July 10, at home in bed or elsewhere. The defendant was apparently picked up at his house by Mary and Mike Davis about noon. After dropping Mary off at a laundromat, defendant and Mike Davis met decedent Murray in Vandalia to discuss a drug deal. Defendant and Davis returned to collect Mary and the laundry and then proceeded to the Davis' trailer home. Allan Richards, who was also living at the trailer, came home from work about 4 p.m. In the early evening Michael and Mary Davis, Allan Richards, and defendant drove to Kroger's parking lot in Vandalia. They met David Olmstead who got into the car with them. The car stopped at several homes, at one of which Michael Davis got out and brought back a "brick" to the car. Olmstead testified that Davis said the "brick" was to weigh down the car. At approximately 8:30 p.m. Michael Davis drove to the farm of Randy Chatham. According to Chatham's testimony, he was visited by Davis, David Olmstead and Allan Richards. He could not recall whether defendant was present at the farm. Olmstead, however, testified that defendant was at the farm with the others. Chatham testified that Michael Davis asked him for a piece of pipe or a breaker bar. David Olmstead also reported a conversation about a breaker bar. Olmstead could not remember whether defendant was present when the request for the pipe or breaker bar was made. Defendant could not remember whether he was present or not during this visit to the Chatham farm. Apparently, Mary Davis did not accompany the others to the Chatham farm. The group remained at the farm for about 30 minutes and then returned to the Davis' home.

The group visited Mike Davis' trailer for about 15 minutes and, now accompanied by Mary Davis, drove around town. They stopped at several houses. At the home of Bob Davis, a relative of Mike Davis, Mike got out and came back to the car carrying a large concrete block. The group's next stop was at the Kroger parking lot where they dropped off David Olmstead. Olmstead testified that during the five hours he spent with the defendant, defendant smoked four or five marijuana cigarettes, but otherwise acted normally. Defendant recalled that he had smoked about an ounce of marijuana and taken four THC pills during the afternoon and evening of July 10. At about 10:30 p.m. Michael Davis had a brief conversation with Larry Murray at Kroger's lot and then drove his wife home. Davis, joined by Allan Richards and defendant, returned to the Kroger lot almost immediately. There they met defendant's brother

Buiel and several other people. Buiel and defendant had a conversation in the back of Davis' car. Buiel asked his brother to come home, but defendant refused. Just before Buiel left the lot, Ruth Ann Meyer, Michael Davis' sister, and her two daughters approached the Davis car. The time, according to Ruth Ann, was 11:15 p.m. She requested her brother to drive her to Shobonier to find Dale Olmstead. After speaking again with Larry Murray, Davis drove the group to Shobonier, but they were unable to find Dale. On the return trip Davis dropped off Ruth and her daughters at his trailer.

Defendant testified that at various times during the day he had observed Davis place several objects in his car. A large concrete block was placed on the rear floorboard of the car and later moved into the trunk. Defendant also noticed a breaker bar and a quantity of wire. These objects were kept directly behind the front seat. Defendant stated that after taking Ruth and her daughters to Davis' trailer, Davis, Richards and he returned once again to the Kroger lot. He recalled that shortly thereafter, Larry Murray pulled into the lot. Murray was accompanied by one other person. Defendant remembered hearing Michael Davis tell Larry Murray to follow him. Both cars proceeded to the Schenker farm. Davis got out of his car and spoke with Murray. Both defendant and Allan Richards remained in Davis' car and were unable to hear the conversation. Davis returned to his car and with Richards and defendant drove to Randy Chatham's trailer. No one was at home, but Davis got out of his car and returned a few minutes later with an unidentified object which he gave to Allan Richards. The three then drove back to the Schenker farm. Larry Murray and Danny Cade were already there. The headlights of Murray's vehicle were turned off. After turning his headlights off, Davis directed defendant to get some marijuana from the glove compartment. All three alighted from the Davis car. Defendant walked to the back of Davis' car and as he began to roll some marijuana cigarettes, he heard Michael Davis say, "Check." Then he heard a thud. Turning around, he saw both Larry Murray and Danny Cade fall to the ground. Murray fell about four feet from him and Cade hit the ground about 12 feet away. Defendant recalled that Murray tried to raise himself from the ground, but was then dragged between the two cars by Allan Richards. Soon defendant noticed Davis and Richards going through the pockets of Murray and Cade.

The defendant told how Davis and Richards then put the bodies in the trunk of Davis' car. Davis told defendant to drive Murray's car to Carbondale or Kentucky and get rid of it. Defendant got into Murray's car but could not move it until Davis moved his car. The accused followed Davis and Richards to the St. Peter-Shobonier blacktop road where they parted company. He then drove Murray's car over a

complicated series of country roads. After driving over 50 miles he left Murray's black-over-red Dodge Charger on old Route 51, south of Centralia. He hitch-hiked to Centralia, getting a ride about 1:30 a.m., and arrived at his house about 2 a.m. Later that day, Friday July 11, 1975, at about 7 p.m., defendant, Davis, Richards, and Ron Lambert had a drink together at a tavern in Centralia.

At trial the State introduced a great deal of physical evidence, none of which specifically linked defendant to the crime. No blood or mud was found on his clothing, though blood and mud were found on the clothing of Davis and Richards and in the trunk of Davis' car. There were indications that Cade and Murray had been robbed, since both Davis and Richards seemed to have large amounts of money on their persons shortly after the killings that they did not have before. But no evidence was offered proving that defendant participated in this robbery or shared in any of the proceeds. Indeed, the State dropped the robbery counts against defendant for lack of evidence.

The police arrested defendant on July 15, 1975, at about 10:30 p.m. in Centralia. They took him to the Centralia Police Station and gave him his *Miranda* warnings. According to the testimony of James McCoy of the Illinois Bureau of Investigation (IBI), defendant stated that he understood his rights and desired to talk. Defendant signed a *Miranda* waiver form and McCoy began to interview him. Pursuant to instructions from his squad leader, McCoy stopped the interview. Defendant was again given his *Miranda* warnings about 11:55 p.m. and the police conducted a taped interview in which defendant stated that he had not spent the evening of July 10, 1975, with either Michael Davis or Allan Richards. He gave the alibi that he had visited with a friend named Craig and girlfriend Janet. About 15 minutes later, defendant made a second statement. The State's Attorney was present and advised defendant of his *Miranda* rights for a third time. In this statement, defendant recalled that about midnight on July 10, Michael Davis and Allan Richards took him to the old Hickory Bridge, let him out, and travelled west on the old Hickory Road. He saw them make a right turn travelling north and they went out of sight. Defendant said they were gone about 20 to 25 minutes. As they approached he observed Michael Davis driving his black Chevrolet. The following car, Larry Murray's Charger, was driven by Allan Richards. The car stopped and Davis told him to get rid of Larry's car. Allan Richards jumped out, handed defendant rubber gloves and told him to use them when driving the car. The accused then added that he followed Davis and Richards down a country road and later drove the car to Centralia via a series of back country roads. He burned the rubber gloves and then hitch-hiked home. During the time defendant was interviewed there was neither a family member nor a lawyer present. At about 1:45

a.m. on June 16, defendant was taken to his home in Centralia to visit with his mother for a few minutes. The police took him to the Marion County Jail in Salem, Illinois.

At about 3 p.m. that afternoon Detective Michael Guerin of the Illinois State Police began another interview with defendant. He again advised defendant of his rights; defendant again signed a waiver form. Defendant stated that Michael Davis picked him up at his home in Centralia around 10 a.m. on July 10. He explained that Davis and he rode around in Centralia for about an hour and later drove to Vandalia where they drove around until the afternoon. In this statement, defendant recalled that Davis had told him that he wanted him to drive a stolen car south on the night of July 10. Defendant also explained that they returned to Davis' trailer that afternoon where they met Allan Richards. Davis, Richards and defendant subsequently met Larry Murray at the Kroger parking lot at approximately 4 p.m. Defendant told Detective Guerin that Davis and he met with Larry Murray in the Kroger parking lot a total of three times. Defendant stated that the last meeting occurred about 10:30 p.m. and that Murray was accompanied by another person. During this interview defendant first mentioned the socket breaker bar and the bundle of wire which he had observed in Davis' car. Defendant repeated his story about the midnight rendezvous with Davis and Richards and the disposal of Larry Murray's car. He also repeated the portion of his previous statement regarding the gloves given to him by Davis and the subsequent burning of them.

Defendant's final statement was given to IBI agent McCoy at about 10:50 p.m. on July 17, 1975, at the Marion County Jail. McCoy testified that he told defendant that he had learned from statements taken from Michael Davis and Allan Richards that defendant's prior statements were "a pack of lies." McCoy began to leave the room when defendant stopped him and asked a question. Defendant stated that he didn't know what to do, whether to talk to an attorney before giving a statement or not. Agent McCoy testified that he told defendant that he had been given his *Miranda* warnings on two occasions and that he knew he had a right to an attorney if he wanted one.

Defendant stated to McCoy that he had been at the scene of the murders and was at the rear of Davis' car when Davis and Richards began hitting Murray and Cade with their weapons. Frightened, defendant had run and jumped in the front seat of Murray's car. All defendant could remember was playing with the accelerator pedal. Defendant explained that he waited in the car until Richards and Davis had loaded the bodies into the trunk of the Davis automobile. Defendant recalled that he then followed Richards and Davis on back roads to Shobonier and finally

drove Murray's car over a complicated series of country roads to Centralia, leaving the car parked where the police later found it.

Agent McCoy next told defendant that he wanted to write this statement down on paper. Defendant refused and stated that he wanted to talk with an attorney before doing so.

Prior to trial, defendant moved to suppress his last statement on the ground that it was not voluntary. The court denied the motion. At the close of the State's case, the State made a motion in limine to prohibit defendant from calling Davis and Richards as witnesses unless defendant could first show that the two would not invoke their Fifth Amendment privilege. In granting this motion the trial court also instructed the State that it could not make any references to the failure of these men to testify. The court also prohibited the State from arguing to the jurors that they could draw any inference from the absence of this testimony. The defense then proceeded with its side of the case.

At the instruction conference defense counsel objected to the court's decision not to give both parts of IPI Criminal No. 3.02, pertaining to circumstantial evidence. Defense counsel argued that as to all facts in issue, the evidence was wholly circumstantial. Defense counsel also objected to the court's giving the jury seven specific guilty forms and only one general not guilty form on the ground that this practice was prejudicial to defendant.

We first consider defendant's contention that he was not proven guilty of the five counts beyond a reasonable doubt. As to the charges of murder and concealment of homicidal deaths, the State never alleged that defendant acted as a principal. The evidence is clear that defendant did not strike the blows that killed the decedents; nor did he load their bodies into the trunk of Michael Davis' car or later throw the bodies into the Kaskaskia River. In order for the State's convictions for murder and concealment of homicidal deaths to stand, the record must establish beyond a reasonable doubt that defendant was accountable for the actions of Michael Davis and Allan Richards. With regards to the murder convictions, the State proceeded on two theories: accountability for an intentional murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(1)) and accountability for felony murder (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(3)). Since we are convinced that defendant was accountable for two intentional murders, we need not and will not discuss his probable accountability under the felony murder theory.

■■ The legislature has provided that a person is legally accountable for the conduct of another when:

> "Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits,

aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c).)

To bring the accused within the purview of this section, it must be established that: he solicited, aided, abetted, agreed or attempted to aid another person in planning or committing an offense; that this participation took place either before or during the commission of the offense; and that the participation was with the concurrent, specific intent to promote or facilitate the commission of the offense. Mere presence at the scene of the crime or negative acquiescence in another's actions is insufficient to make a defendant accountable, but one may aid and abet without actively participating in the overt act. (*People v. Nugara,* 39 Ill. 2d 482, 236 N.E.2d 613; *People v. Morgan,* 39 Ill. App. 3d 588, 350 N.E.2d 27.) If the proof shows that a defendant was present at the commission of the crime without disapproving or opposing it, the trier of fact may consider this conduct in connection with other circumstances and reach the conclusion that the accused assented to the commission of the crime, lent to it his countenance and approval, and was thereby aiding and abetting it. (*People v. Torres,* 19 Ill. 2d 497, 167 N.E.2d 412; *People v. Dickens,* 19 Ill. App. 3d 419, 311 N.E.2d 705.) Even in the absence of any evidence that defendant committed an overt act, the trier of fact could still have found him accountable for the actions of his co-defendants where uncontradicted evidence established his continued close affiliation with his co-defendants and his failure to report the incident or even to confide in anyone about it. This was evidence that defendant shared the common purpose of the group and was sufficient to sustain his conviction for the acts of the group. *People v. Johnson,* 35 Ill. 2d 624, 221 N.E.2d 662.

▪▪ The record in the instant case establishes that defendant spent a great deal of time with Michael Davis and Allan Richards during the three days before the killings. He accompanied Davis during three or four meetings with decedent Murray during the afternoon and evening before the crime. According to defendant's and Mary Davis' testimony, the purpose of these meetings was in part to arrange a drug deal, presumably to occur that night. Defendant admitted to Detective Guerin that he was told by Davis and Richards that they would have a stolen car for him that same night. On the evening of the crime, defendant observed co-defendant Davis acquire and place in his car one of the apparent murder weapons and the items later used in disposing of the bodies. About an hour before the killings defendant's brother tried unsuccessfully to convince the accused to come home with him. Instead of going home, defendant accompanied Davis and Richards to the scene of the crimes. The two victims were requested by Davis to follow in their car. Soon

after reaching the farm where the fatal beatings occurred, defendant, Davis and Richards left and drove to a neighboring farm. There Davis found and gave to Richards an object that was, according to the prosecutor, the second murder weapon. The three returned to the crime scene. In the dark, defendant and Davis and Richards got out of their car. Defendant, apparently to divert the attention of the victims, walked to the rear of the car and began to roll marijuana cigarettes. On a prearranged signal given by Davis, Davis and Richards vented their murderous wrath simultaneously upon the victims. Defendant watched. The bodies of Murray and Cade fell to the ground almost at his feet. Defendant also watched as Davis and Richards rifled their victims' pockets.

In light of the foregoing circumstances, we are persuaded that defendant did not want to withdraw from the group at any time prior to the commission of the murders. Rather, he desired to be present at the scene of the crimes. He never demonstrated any opposition to the group's apparently well-planned actions. Indeed, he witnessed and perhaps participated in the meetings to arrange the encounter at the Schenker farm and lent his countenance and assent to the group's venture. Although he did not share in the money taken from the victims, he furthered the crime by disposing of the decedent's car. It was not inconceivable that defendant would have assisted Davis and Richards without expecting a monetary reward, particularly when his role was limited. Davis and Richards were friends of defendant and kept him supplied with illegal drugs. At no time did the accused attempt to warn the proper law enforcement authorities to prevent the execution of the group's plan. At no time did he attempt to warn the victims of the possibility of foul play. And he did nothing to prevent the fatal beatings which happened just a few feet away from him. Finally, the evidence clearly establishes that defendant was not so under the influence of drugs as to be dispossessed of his reason. The testimony shows that defendant acted normally under the circumstances and was able to remember the events of the night of killings with precise detail.

Defendant contends, citing *People v. Holsapple,* 30 Ill. App. 3d 976, 333 N.E.2d 683, that the State failed to negate a reasonable hypothesis of defendant's innocence. Defendant suggests that he had no idea what Davis and Richards had in mind for the decedents before they began to beat them and that he fled in decedent's car in compliance with Davis' order to avoid harm to himself. Insofar as defendant asserts that he acted out of ignorance, fear or compulsion, we find his argument without merit. We believe defendant knew what Davis and Richards had in mind for their victims. In addition, the defense of compulsion (see Ill. Rev. Stat. 1975, ch. 38, par. 7—11) was not available to defendant because the

offense charged was murder and because there was no evidence that defendant had been actually threatened by Davis or Richards. Defendant did not immediately drive to the nearest police station to report the crime. Instead, he took a circuitous route and abandoned the car by the side of the road. He burned the gloves he had worn while driving the vehicle. That he might have feared his co-defendants is further negated by the evidence that he met them for a drink on the evening following the crime.

Defendant's disposal of decedents' car also allowed his co-participants to dispose of bodies and aided and abetted their concealment of the victims' deaths. Although defendant testified that he believed the victims to be alive at the time he departed south in decedents' car, we find unreasonable any suggestion that defendant was unaware of the victims' fate once their bodies had been loaded in the trunk and he had been told by Davis to get rid of the victims' car. By driving this vehicle away from the scene of the fatal beatings, defendant shared in the common design of the group to cover up the crimes. Both defendant's and his co-defendants' actions were in furtherance of this design and each was accordingly accountable for the acts of the other group members. (*People v. Rybka*, 16 Ill. 2d 394, 153 N.E.2d 17.) Under these circumstances, the jury was justified in concluding that defendant subscribed to an unlawful venture which fostered an atmosphere of violence and, as a natural consequence, resulted in the deaths of Larry Murray and Danny Cade and the concealment of their fate accomplished by affirmative action. The accused was, therefore, guilty of two counts of murder and two counts of concealment of homicidal death on a theory of accountability.

Moreover, the evidence establishes beyond a reasonable doubt that defendant was also guilty of obstruction of justice. According to the provisions of section 31—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 31—4):

> "A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he knowingly commits any of the following acts:
>
> (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information; or * * *."

As hereinabove stated, defendant's act of removing the decedents' vehicle from the scene of the crime and leaving it by a roadside many miles away was an act designed to cover up his and his co-defendants' crimes. It was a reasonably effective and intentional means of concealing material physical evidence to prevent his and their apprehension. Upon discovering the car, the investigating officers did not immediately suspect that its owner was the victim of foul play. We harbor no doubts that the jury was justified in finding defendant guilty of obstructing justice.

■■ The record indicates that after the prosecution rested and before

the defendant began his defense, outside the presence of the jury, the prosecution made a motion "in limine" to limit the examination or any attempted examination of co-defendants, Davis and Richards, in this case until and after the court has had an offer of proof. The prosecution contended that according to *People v. Myers*, 35 Ill. 2d 311, 220 N.E.2d 297, it is improper to call a witness whom he knows will attempt to take the Fifth Amendment or will take the Fifth Amendment in response to the first question on the stand or any questions. The defense counsel in his reply to this motion stated "that his failure to call them as a witness could be and would be presumed against defendant by the jury as evidence of his guilt under the peculiar sort of a lawsuit he has before this court in this case." A short recess was taken and the court announced its ruling on the prosecution's motion in limine as follows:

"Defense counsel is precluded from calling them [the two co-defendants] if he has prior knowledge they are going to take the stand and invoke the Fifth Amendment which I think the case law is. If Mr. Burnside has that knowledge on behalf of his client then he's precluded from calling them and putting them on the stand and hearing them invoke the Fifth Amendment. And, in turn, if he does not do that, then the State is not allowed to refer to a failure to call these people as witnesses in any argument or any reference or presentation at any time."

Upon an inquiry by the prosecution, the court indicated that if the defense wanted to call the two witnesses in question, it would be necessary to make an offer of proof beforehand. There was no objection by counsel, and the jury then returned to the courtroom to hear the defense.

In *People v. Myers*, 35 Ill. 2d 311, 220 N.E.2d 297, the supreme court affirmed defendant's murder conviction over his contention that he was prejudiced by the trial court's refusal to permit him to call an accomplice. The propriety of the trial court's ruling was upheld where such witness had previously invoked the Fifth Amendment with respect to a request that she produce some incriminating documents and where it was apparent that she would invoke the privilege again where she would be called to the stand. The defendant argues that the holding in *Myers* is not applicable to the instant case where the witnesses had not already invoked the Fifth Amendment. Unlike the defendant in *Myers,* the defendant in the instant case was not barred outright from calling his co-participants to the stand—he was precluded from calling them *only if* he had prior knowledge that they would refuse to testify. If the defense had any doubts as to their refusing, it could have called the co-defendants. Because the defense did not do so, and because it offered no proof as to the unlikelihood of the assertion of the Fifth Amendment, the defendant

indicated either a lack of desire to call them in the first place, or an acknowledgment of their intent to invoke the Fifth Amendment.

On the basis of the trial record and the argument of defense counsel, it appears that defense counsel was only arguing for the right to call his co-defendants—knowing full well that they would refuse to testify to anything—as a gesture of his good faith. Under the *Myers* opinion, the trial court was vested with the discretionary power to prohibit the defendant from calling his co-defendants to the stand under those circumstances. Consequently, the ruling of the trial court was proper.

■■ Defendant also contends that the prosecutor's closing argument was improper and prejudicial on two different occasions. He first assigns as improper the prosecutor's following comments regarding defendant's failure to introduce into evidence statements made by the co-defendants who were being tried separately:

> "Counsel says to you, and I would like to respond to this, that we have statements from Davis and Murray. Excuse me, Davis and Richards, on the evening of the 17th and why didn't the People introduce those statements. Counsel had those witnesses on the stand. If, in fact, they were going to help his client, why didn't he introduce those statements? Because they wouldn't have helped his client, I think you can infer."

These comments, which were not objected to, referred to statements alluded to only once by IBI Agent James McCoy, a State's witness. McCoy testified that during an interview with defendant he told him that he had learned from statements taken from co-defendants Richards and Davis that defendant's prior statements were "a pack of lies." Neither defense counsel nor the prosecutor questioned McCoy about the co-defendants' statements.

The second set of remarks made by the prosecutor in closing argument consisted of the following:

> "[James Cole] *was there. He saw what happened and he didn't do anything.* Now, by his own testimony, he claims at least one of the people was still alive at the scene. That may be. I doubt that. But, if that person was still alive, what did he do to save that person's life? What did he do to go to the police? What did he do to intervene and say, 'hey you guys, what's going on?' He didn't do anything. He just stood there and, according to his testimony, he didn't look out of the corner of his eyes, didn't see anything, just stood there. That is convenient, but not very believable and *by failing to intervene, he took some action.* He *took some very significant action* in the lives of Murray and Cade, action which cost them their lives and that is by his own testimony." (Emphasis added.)

The record discloses that defendant made no objection to either of these remarks. Consequently, the defendant is precluded from raising the issue of their propriety on appeal. (*People v. Skorusa*, 55 Ill. 2d 577, 304 N.E.2d 630.) It is also significant that defendant did not assign the making of these remarks as error in his motion for new trial. It has been well established that the failure to raise an issue in a written post-trial motion constitutes a waiver of that issue. *People v. Pickett*, 54 Ill. 2d 280, 296 N.E.2d 856; *People v. Hairston*, 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.

The fourth point raised by the defendant in his appeal contended that the trial court erred in refusing to give the jury the second paragraph of the Illinois Pattern Jury Instructions (IPI), Criminal, No. 3.02. This point has been withdrawn as an assignment of error by the defendant.

■■ Defendant's final contention is that the trial court erred in giving seven specific guilty forms and only one general not guilty form. Defendant cites no authority, but argues that the submission of seven guilty forms and one not guilty created the impression to the jury that the court believed defendant was guilty.

We initially note, as does the defendant, that the procedure followed by the trial court judge is the procedure recommended by the IPI, Criminal, and the Committee Notes. We do not believe that this procedure prejudiced defendant. The failure on the part of the jury to sign a particular verdict form is by law a verdict of not guilty on that charge. (*People v. Potts*, 403 Ill. 398, 86 N.E.2d 345.) We thus do not agree with defendant's suggestion that the forms may have confused the jurors into believing that they either had to sign all seven guilty forms or sign only the not guilty form. For example, if the jury had desired to find defendant guilty of two counts and not guilty of the other five, it could easily have done so by signing only the two desired forms. The forms did not prevent the jury from being deadlocked regarding any of the charges. By submitting the forms in the manner recommended, the trial court, in our opinion, chose a method simpler than submitting seven guilty forms and seven corresponding not guilty forms. On this record we can find no errors in the manner of submitting the verdict forms.

■■ Turning lastly to an issue not raised in the briefs but mentioned during oral argument, we address the question whether it was proper to enter judgment on the concealment of homicidal death guilty verdicts and the obstruction of justice verdict. Was the conduct constituting these offenses independently motivated or otherwise separable from the conduct constituting the murder convictions?

Our review of Illinois case law concerning this issue shows no cases involving these particular crimes. We are convinced, nevertheless, that the conduct constituting the murder offenses was independently

motivated and separable from the conduct constituting the other three offenses. (See *People v. Williams*, 60 Ill. 2d 1, 322 N.E.2d 819; *People v. Lipscomb*, 19 Ill. App. 3d 114, 311 N.E.2d 257; *People v. Malcom*, 14 Ill. App. 3d 378, 302 N.E.2d 352.) The record establishes that defendant asserted and lent his countenance to the planning and commission of both murders and was thus legally accountable for them. His conduct thereafter, sharing in the common design of covering up the crimes, was separable and independently motivated from his conduct prior to the fatal beatings. We harbor no doubt that both murder convictions, which were based on the theory of accountability and upon which concurrent sentences were imposed, were proper. *People v. Butler*, 64 Ill. 2d 485, 356 N.E.2d 330.

Although their motivation to escape detection prompted the defendants to dispose of the bodies and to remove the car, the supreme court has ruled that motivation is no longer determinative of whether the conduct will support separate convictions. *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838. In sustaining the defendant's convictions for both rape and burglary with intent to commit rape, the supreme court in *King* stated:

> "We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." 66 Ill. 2d 551, 566.

Applying the language in the *King* case to the facts before us, we conclude that where the charge of obstruction of justice was predicated upon conduct which was distinct from that comprising the offense of the concealment of a homicidal death the trial court properly entered judgment upon the verdict of obstruction of justice.

Accordingly, we affirm the judgment of the Circuit Court of Fayette County on the convictions for murder, the convictions for concealment of homicidal death, and the conviction for the obstruction of justice.

Judgments affirmed.

JONES and G. MORAN, JJ., concur.