(No. 35300.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ROBERT B. WESLEY, Plaintiff in Error.

*Opinion filed November 18, 1959—Rehearing denied Jan. 18, 1960.*

EUGENE J. BABIARZ, of Chicago, for plaintiff in error.

GRENVILLE BEARDSLEY, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, and WILLIAM H. SOUTH, Assistant Attorneys General, and FRANCIS X. RILEY, and WILLIAM W. WINTERHOFF, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAVIS delivered the opinion of the court:

The defendant, Robert B. Wesley, was indicted in the criminal court of Cook County for the murder of George Washington and waived a jury trial. The court found him guilty, denied his post-trial motions and sentenced him to confinement in the penitentiary for a term of 14 years.

Defendant admitted that he stabbed Washington in the chest with a screwdriver and it is undisputed that Washington died within a short time thereafter and that his death was caused by a stab wound near the upper edge of the sternum which produced a rent in the ascending aorta and pulmonary artery.

Defendant claims that he struck the blow in self-defense and that the killing was therefore justified; that the evidence did not establish his guilt of the crime charged beyond a reasonable doubt, in that there were no facts or circumstances denoting malice aforethought; that he was denied a fair trial by certain conduct of the trial judge; and that the court erred in its rulings on the admission and exclusion of evidence.

The three principal occurrence witnesses for the People were Pauline Wesley, Florence Brown and Audrey Williams, married women who went to the Off Corner Tavern together on the evening of August 10, 1956, at about 11:00 P.M. Mrs. Brown and Mrs. Williams stated that they were out for the evening with the permission of their respective husbands. Mrs. Wesley, who was then pregnant, married defendant in December, 1955, but had been separated from him since March, 1956. After arriving at the tavern they met Washington, who, according to Mrs. Williams, was a mutual friend of her husband and herself. The four sat at a table drinking beer. Later, Washington introduced a man named Roosevelt who joined the party. When the Off Corner Tavern closed at 2:00 A.M. Washington suggested that they go to the C & C Lounge which was located at the corner of south Cottage Grove Avenue and 65th Street in the city of Chicago. The party of five drove there in Roosevelt's car and arrived at about 3:00 A.M.

There were two entrances to the lounge, one at 6517 and the other at 6519 South Cottage Grove. The first led to a bar room and the next to an adjoining restaurant. A corridor connected the rear of the restaurant with a large ballroom and a check room. The ballroom was located back of the tavern and restaurant. It was equipped with tables and space was reserved for dancing. An orchestra stand was at the rear of the ballroom and a ladies rest room was located to the left of it.

Mrs. Wesley testified that when the party arrived there were no seats; that she and the two men stood in the tavern waiting while Mrs. Williams and Mrs. Brown went to the restroom, and that she finally took a seat at the bar. After she had been there five or ten minutes she saw her husband enter with a man named Kenny. Washington and Roosevelt were standing nearby at the time. Mrs. Wesley further stated that defendant came over and said that he wanted to talk to her; that she told him she had nothing to say whereupon he jerked her off the stool and pulled her outside; and that, after some conversation, he told her that he would give her some money but had to cash a check and they re-entered the building through the restaurant door for that purpose.

Defendant was unable to cash the check in the restaurant, and finally obtained the money from a girl employee at the bar. Mrs. Wesley and defendant then went through the corridor and into the ballroom. They sat with Kenny at a table at the back of the room near the entrance. Defendant ordered three bottles of beer and told Mrs. Wesley that he wanted her to accompany him when he left the premises. She replied that she would leave with her friends who had brought her.

Meanwhile, Mrs. Williams, Mrs. Brown, Washington and Roosevelt had been seated at a nearby table, separated by a narrow aisle. Mrs. Wesley testified that Mrs. Brown, who was her sister-in-law, came over and asked the witness to accompany her to the rest room. As they started in that direction and were passing the table where Mrs. Williams, Roosevelt and Washington were seated, Mrs. Williams asked Mrs. Wesley if she was going to leave with them. Mrs. Wesley replied that she wanted to, but didn't want to start anything and defendant thereupon jumped to his feet, said: "She is not going anywhere!" and rushed over and stabbed Washington while he was seated.

Mrs. Wesley testified that this happened about ten or fifteen feet from where she was standing; and that she saw defendant strike Washington in the chest with an object he held in his right hand, but she couldn't see it well enough to tell what it was. She was positive that prior to the occurrence there had been no conversation between those seated at the two tables.

She further testified that Washington said nothing to defendant prior to the stabbing; that she saw nothing in Washington's hands at the time; that he was "just sitting there;" and that when Washington was struck he fell over backward to the floor and his chair fell with him. After the assault, Mrs. Wesley stated that she saw several men "rush" defendant out of the place after which she accompanied Mrs. Brown to the rest room and later left the building with her. An extensive cross-examination served only to emphasize that the witness was in a position to see and hear that which she had testified to in her direct examination.

The testimony of Mrs. Williams corroborated the statements of Mrs. Wesley relative to the occurrence and antecedent events. She testified additionally that Washington fell to the floor in a sitting position after he had been assaulted; that defendant was rushed out of the place by several men and she tried to follow but was shoved back into the restaurant; and that when she returned she found Washington crawling in the corridor, "cut and bleeding." She also stated that she called the police and an ambulance, but that an employee named Ashley took Washington to the hospital in his car; that she and several others went along; and that a doctor pronounced Washington dead on arrival and she later saw his body there.

Mrs. Williams also related that she had been in defendant's home in October of 1955; that defendant then showed her some sort of weapon with a long thin blade on a handle like a cane which turned. She further stated that a man

known to her as Woodrow Peete showed her a pocket knife after the stabbing which he stated belonged to deceased; that she asked him whether Washington had the knife out and he told her he didn't; and that this knife was closed when she saw it. She saw no object in deceased's hands when he was struck by defendant and he did not strike back. On cross-examination she admitted that before the assault, and as defendant approached her table, she warned Washington that defendant might have a knife. She denied that Washington said: "I have a knife too," but admitted that she had seen Washington's knife prior to the night in question.

Mrs. Brown's version of the stabbing was essentially that related by Mrs. Williams and Mrs. Wesley. She testified additionally that she heard defendant say that Pauline "wasn't going anywhere" as he started toward the other table; that she pulled Mrs. Wesley into the rest room after seeing the assault; that when they returned later they saw a pool of blood in the corridor in front of the check room; and that she took Mrs. Wesley home in a cab.

Several police officers testified for the People. William McArdle, attached to the Woodlawn station, testified that on August 11, 1956, at about 3:30 A.M. he received a call from the Woodlawn Hospital; and that he went there and ascertained that a man who had been brought in was pronounced dead on arrival. He also testified that a man known to him as Jake Fuller handed him a small pocket knife which he said had been given to him by the deceased. It was about three inches long and closed at the time.

Another officer, Matthew A. Ferguson, testified that on August 13, 1956, at about 2:30 P.M. he received a telephone call from a friend who operated a restaurant stating that defendant was there and wanted to give himself up and that he went to the restaurant and arrested defendant. He testified that defendant told him, among other things, that he had picked up a screwdriver which

he found in the street before entering the C & C Lounge; that while there, he and his wife were seated at a table; that she had previously been at a nearby table with a mixed party; that a man at that table kept saying something about defendant and his wife and finally got up as though to come toward his table; and that it appeared to defendant that the man was reaching into his pocket to "get something," whereupon defendant struck him with the screwdriver. Ferguson further related that defendant also told him that he had thrown the screwdriver away in an alley. They searched the alley together but could not find it.

The defendant testified that he went to the C & C Lounge with a friend; that when he saw his wife there he told her she had no business being up so late in "her condition;" that after they had some beer and Scotch he asked her about the people she was with and whether one of the men was "her boy friend;" that she replied that "when she had her fill" she would come home; and that during this conversation he heard someone say, "I don't give a damn who he is." Defendant related that he told his wife he was going to have a check cashed and give her some money; that they left the tavern "hand in hand;" that the "man" followed them; and that they entered the restaurant and Charles Ashley cashed his check.

Defendant further testified that his wife said that she wanted to sit down and drink with him but the "man" who had followed them into the restaurant told them that he had no time for beer and asked defendant to "get the hell out of there." Defendant said he told him that the woman with him was his wife; and that he could drink with her if he wanted to. Whereupon defendant and his wife went back to the corridor to the ballroom where they saw Frederick Douglas, and defendant told Douglas that he had three people with him and wanted a table and three beers and Douglas indicated that he would take care of him.

Mrs. Wesley then told defendant that she was going to the rest room with Mrs. Brown and he told her to "go ahead;" and that a table would probably be ready when she returned. Defendant further testified that after Mrs. Brown and his wife had gone to the rest room and while defendant and others were still standing in the corridor he heard someone behind him say, "Look out, Bob!"; that he pivoted and saw the man who had been arguing with him about his wife coming toward him with a "shiny object" in his hand; and that he threw up his arm to ward off the blow, pulled a screwdriver from his pocket, struck the man one time with it and ran, at which time Ashley hit him from behind and thereafter he crawled out of the place and ran away.

Defendant further related that he was afraid to go home; that he went to his sister's home in Gary where he stayed until Monday, August 13, when he saw an article in the paper stating that the man had died; and that after discussing the situation with his sister, he decided to return to Chicago and give himself up. He denied that Mrs. Williams had ever visited in his home; or that he had ever owned or shown her a weapon with a cane-like handle such as she described in her testimony.

When cross-examined, defendant stated that the affray had not taken place near a table in the ballroom but rather in the corridor while he and others were standing in line. His attention was then called to a signed statement he had given the police in which he related that the fight had taken place in the ballroom when the two parties were seated at nearby tables. While admitting that his signature was on the statement, defendant claimed that the facts related in it were incorrect; that he had "only glanced at it" before he signed it; and that he had not read it because he was too nervous to read at the time.

Charles Ashley testified for the defendant. His version

of the occurrence was much the same as that given by defendant on direct examination. In addition he stated that he knew Washington and that he heard him tell Mrs. Wesley to "jump into the car;" that it was "running outside." He testified that he saw Washington follow defendant and his wife toward the corridor and saw him standing there after Mrs. Wesley and another woman had gone to the rest room; and that a little later someone at the restaurant counter called his attention to "those two fellows fighting." He stated that he jumped over the counter and ran to the corridor where he found Washington slumped to the floor and defendant striking him "with some object."

Ashley said that he hit defendant on the back of the head and knocked him to the floor; that defendant did not get up but crawled out the door into the street; and that he and Douglas chased defendant some distance and lost sight of him when he ran into an alley. When Ashley returned Washington was still lying in the corridor by the check room and Jake Fuller was with him. Defense counsel asked Ashley if Washington made a statement at that time but the court sustained an objection and he was not allowed to answer. Ashley then related that Washington had a knife in his hand which Fuller took from him and that they then took Washington to the hospital in his car. Ashley said that he helped undress Washington and saw a package of marijuana cigarettes taken from his clothes. The court sustained a motion to strike this remark.

In further direct testimony Ashley denied that defendant and his wife sat at a table in the dance hall that morning. He was positive that Washington had never gotten any further than the corridor. The object he saw in defendant's hand during the affray looked like a "stick or something," but he didn't see that Washington had anything "until they picked him up off the floor."

On cross-examination, after his attention was called to a written statement which he had given the police, the witness admitted that he told the officers that defendant had an object which looked like a walking cane and that at the coroner's inquest he had said, "I saw something like a walking cane that Wesley was striking with, but later I understand he said it was a screwdriver. I thought it was a gimmick of some kind. It didn't look like a knife but evidently it was sharp." Ashley also admitted that he didn't know whether the knife given him by Fuller which purportedly belonged to Washington was open or closed at the time; that he did not know how the fight started; and that the others could have gotten a table in the ballroom without his knowing about it.

Frederick Douglas was originally called as a witness for the People. He testified on direct examination that he was employed at the C & C Lounge at the time in question and that it was his job to tend the entrance to the ballroom where he held a chain or rope and allowed patrons to enter only as tables were available. He said that defendant came into the corridor with another man and two women, asked for a table and ordered three bottles of beer. He said that he let Mrs. Wesley through the chain to go to the restroom and as he stood there holding the chain someone "hit up against him" from behind and he heard a voice say, "Look out, Wesley." He turned and saw a man with a "white object" in his hand, which witness presumed was a knife, struggling with defendant.

Douglas said that he saw defendant block the other man's hand after which defendant pulled an object from his back pocket that looked like a stick or cane. Both men fell to the floor and defendant was striking at the man whom he later learned was Washington.

Douglas corroborated Ashley concerning the flight and chase of defendant. He first testified that he hadn't seen

Washington earlier that evening, but later remembered that he directed him back to check his hat and coat. He stated that no one could get a table without passing him, then recalled that there was an additional entrance which another man was tending at the time.

On redirect examination, Douglas was asked whether he told the officers that deceased had a knife in his hand. Defense counsel objected on the ground that nothing had been said about this on direct or cross-examination. This objection was overruled by the court and witness stated he had told the police about the knife. The State's Attorney then asked to call Douglas as an adverse witness to show that he did not tell the police about the knife. Counsel for defendant objected on the ground that the People should not be allowed to impeach their own witness. The court overruled the objection and called Douglas as the court's witness, thereby giving both counsel the right of cross-examination.

The State's Attorney then directed Douglas's attention to a certain written statement bearing his signature which gave his version of the affair. The witness admitted that it did not state that he had seen a knife in the hand of deceased at the time. He insisted, however, that he told the police about it although he couldn't explain why it was not in the written statement. He also admitted that he was asked at the conclusion of his statement whether he had anything to add and that he replied "That's it," despite the lack of reference to a knife. Defense counsel's motion to strike all of this testimony was denied. He then availed himself of the opportunity to cross-examine the witness.

Defendant urges that the court erred in allowing the State's Attorney to cross-examine Douglas and in designating him as a court's witness for purposes of further examination. It is a general rule that a party who calls a witness to testify cannot directly impeach his testimony, but certain exceptions indicate that the rule may be in the

process of erosion. Thus, where the witness unexpectedly gives testimony against the party calling him, such party has the right of examination to show that the witness gave surprise testimony and to specifically call his attention to former inconsistent statements made by him for the purpose of refreshing his memory or awakening his conscience to the end that he may relent and speak the truth if he is lying. *People* v. *Michaels,* 335 Ill. 590; *People* v. *O'Gara,* 271 Ill. 138.

Likewise, where a witness for the People gives surprise testimony on cross-examination by the defendant, the court may properly allow the People to examine the witness to show such fact and to call his attention to former statements. (*People* v. *Quevreaux,* 407 Ill. 176; *People* v. *Rongetti,* 344 Ill. 278.) The extent to which such cross-examination shall be permitted rests largely in the discretion of the trial judge who can best pass upon the question from the manner of the witness, his attitude and appearance. (*People* v. *Roberts,* 306 Ill. 240; *People* v. *Cotton,* 250 Ill. 338.) Subject to the factual situations involved, the principles set forth in the cases relied upon by defendant are not contrary to those above set forth.

The implication of *McCray* v. *Illinois Central Railroad Co.* 12 Ill. App. 2d 425, is that surprise must be claimed at the earliest opportunity. We concede that the party claiming surprise should do so with diligence, but we believe that the ultimate decision as to when such cross-examination is to be received is best left to the sound discretion of the trial judge depending upon the facts and circumstances developed at the trial. This view is consistent with the principles heretofore announced. However, the allowance of cross-examination in this case was correct even under the holding in *McCray.*

Additionally, defendant contends that the court should not have called Douglas as a court's witness because no proper foundation was laid. He relies upon *People* v. *Rob-*

*inson,* 14 Ill.2d 325, and *People* v. *Touhy,* 361 Ill. 332, and similar cases which involve the propriety of calling a witness as a court's witness before he has given any testimony in the case. Defendant reasons that unless the State's Attorney specifically requests the court to call a person as the court's witness and shows why he cannot vouch for his veracity, the court should not subsequently do so. However, where it appears to the court during the interrogation of a witness that his testimony is unexpected and may be of doubtful veracity, we have held that it is proper for the trial judge to make him the court's witness. *People* v. *Quevreaux,* 407 Ill. 176.

While the State's Attorney did not specifically request that Douglas be designated a court's witness, he did ask the privilege of cross-examination after he demonstrated that he had been surprised by unexpected testimony. Apparently the trial judge thought that it was better practice to make Douglas the court's witness before proceeding further. The fact that he did so on his own motion did not prejudice the rights of the defendant and we find no error in such procedure.

Defendant assigns as error the refusal of the trial court to permit the witness Ashley to testify concerning a statement allegedly made by deceased as he lay in the corridor following the stabbing and after Ashley had returned to the premises from his fruitless pursuit of the defendant. It is claimed that the statement should have been admitted as part of the *res gestae.* The record shows that defense counsel asked Ashley whether the deceased made a statement at that time. The court sustained an objection to the question and no further questions were asked and no offer of proof made. There is nothing in the record to show the substance of the alleged statement, or that such statement was in fact made. Under these circumstances, there is no basis upon which we can determine the propriety of the trial court's ruling.

Defendant offered to prove by the witness Ashley that a package of marijuana cigarettes was found in Washington's clothing when he was undressed at the hospital. The court properly denied the admission of this testimony. The mere fact that a person possesses narcotics is not proof of use or addiction. In a homicide prosecution, evidence of addiction, without more, is not admissible for the purpose of determining the aggressor. There must also be proof or offer of proof that the subject was dangerous or violent when under the influence of narcotics and that he was under such influence at the time of the homicide. (*People* v. *Moretti*, 6 Ill.2d 494.) We reject defendant's suggestion that the proof offered in this case would raise the inference that deceased was a violent and dangerous man.

On direct examination Mrs. Williams testified that the defendant had shown her a sort of "gimmick" knife on a certain occasion when she visited his home. When cross-examined, Mrs. Williams was questioned at some length about this occurrence and finally admitted that she had been in defendant's home only once. The obvious purpose of such interrogation was to raise the inference that the witness was lying about the incident in that it was not probable that defendant would have shown her such knife on her first visit in his residence. Counsel for defendant also asked her whether she had told the State's Attorney about the incident prior to giving her testimony and she replied that she had.

On redirect examination she was allowed to testify, over objection, that she brought up the subject of seeing the knife when she talked to the State's Attorney. Defendant claims that this testimony violated the general rule that a witness should not be permitted to testify concerning statements made out of court for the purpose of corroborating his testimony given at the trial relative to the same subject. We recognize this general rule, but conclude

that the testimony in question was proper since defense counsel himself brought out on cross-examination that the witness had told the State's Attorney about this incident prior to trial. In view of the scope of his cross-examination, he cannot complain of reference to the same conversation with the State's Attorney on redirect examination. The testimony on redirect was merely explanatory of the testimony given on cross-examination in answer to questions propounded by defense counsel, and it was not subject to objection.

Eola Moffet, an aunt of the deceased, testified on direct examination that she had seen deceased in her home on August 10; that he was apparently in good health at the time; and that she identified his body at an undertaking establishment on August 11. On cross-examination defense counsel asked her whether there was a claim against the tavern for George's death and the court sustained an objection to the question.

Defendant contends that he should have been permitted to show the bias of this witness and her interest in the outcome of the case. Mrs. Moffet was not an occurrence witness and did not testify relative to any disputed issues. Her testimony established that the victim of the homicide was in fact George Washington, as alleged in the indictment. Bias or interest could not slant her answers to the questions asked on direct examination and the fact that the witness was an aunt of deceased did not establish that she would have been a beneficiary of such claim, if made. The court properly sustained the objection to this question.

In urging that the conduct of the trial judge deprived him of a fair and impartial trial, defendant stresses certain remarks made by the court during the examination of the witness Ashley and contends that the court assumed the role of an advocate in questioning certain witnesses including the defendant. A trial judge has the right to question witnesses in order to elicit the truth or to bring en-

lightenment on material issues which seem obscure. *People v. Marino*, 414 Ill. 445.

The propriety of judicial examination is determined by the circumstances of each case and rests largely in the discretion of the trial court. (*People v. Trefonas,* 9 Ill.2d 92; *People v. Marino,* 414 Ill. 445.) It should rarely be extensive and should always be conducted in a fair and impartial manner. (*People v. Bernstein,* 250 Ill. 63.) In conducting an examination the trial judge should never depart from his function as a judge to assume the role of an advocate. (*People v. Trefonas,* 9 Ill.2d 92.) The proper length or nature of such examination depends on the circumstances of the case and even a rather extensive examination may be justified if the court has reason to believe that a witness is not telling the truth. *People v. Giacomino,* 347 Ill. 523.

During the trial, reference was made by defendant and witnesses Douglas and Ashley to the term, "Geeche man." Defendant used that term in addressing Douglas and Ashley and they testified that they similarly addressed defendant. The court asked defendant what the term meant and whether there was a loyalty between "Geeche people." Defendant claims that this was "beyond the bounds of judicial discretion." There is nothing in the record to indicate that the examination was conducted in an unfriendly or harsh manner or that the court exhibited anything other than an impartial curiosity in making the inquiry.

From the testimony of defendant, Ashley, and Douglas, it could have been concluded that the term indicated that there was some bond between them. In answer to the court's query, defendant stated that the term referred to a place in the West Indies and that there was no loyalty among "Geeche people" that he knew of. Defendant's rights were not prejudiced by this judicial examination and thereby the court did not assume the role of the prosecutor.

The court's examination of Ashley and remarks made

in connection therewith are also assigned as error. It may fairly be said that some of the statements made by the trial judge were not of that temperate, calm and dispassionate nature which should be a part of the judicial process. However, the record shows that on direct examination Ashley was at times inconsistent and reckless in his statements and that he was evasive in some of his responses when cross-examined. It was at those times, while under provocation, that comments were made and questions asked by the trial judge. The questions were asked to clarify uncertainties apparently existing in the mind of the court. While the statements made by the court would have been more appropriate in his remarks in connection with his decision, in view of all the circumstances, the defendant was not thereby deprived of his right to a fair and impartial trial.

The defendant further contends that the evidence failed to show that he killed the deceased "pursuant to cool, premeditated deliberance." However, evidence of a deliberate intent to kill is not required to sustain a charge of murder. If a person voluntarily and wilfully does an act the direct and natural result of which is to destroy another's life, the conclusion, in the absence of qualifying facts, is that the destruction of the other person's life was intended, and proof of a deliberate intent to kill is unnecessary. It is sufficient if the killer either intended to kill the person assaulted or is actuated, in making the assault, by that wanton and reckless disregard of human life which denotes malice. *People* v. *Johnson,* 2 Ill.2d 165; *People* v. *Marrow,* 403 Ill. 69.

In this case defendant admitted that he stabbed deceased in the chest with a screwdriver. The natural and probable result of such act is death to the victim. According to the witnesses for the People, defendant stabbed the deceased under circumstances which showed no legal provocation for the assault and an absence of facts to qualify or

preclude the conclusion that defendant intended to kill decedent. Under the statute defining murder, malice is implied when no considerable provocation appears, or when the circumstances of the killing show an abandoned and malignant heart. (Ill. Rev. Stat. 1957, chap. 38, par. 358.) The evidence for the People clearly shows that the homicide occurred under circumstances which make the defendant guilty of murder. Where such is the case the burden of proving circumstances in mitigation which justify or excuse the homicide devolves upon the accused. Ill. Rev. Stat. 1957, chap. 38, par. 373; *People* v. *Tripp*, 392. Ill. 351.

In the case at bar, defendant claimed self-defense. It was the testimony of defendant and his witnesses, Douglas and Ashley, that the affray took place in the corridor to the ballroom after deceased, with knife in hand, had approached defendant from behind. The witness Ashley admitted that he did not see how the affair started. According to the witnesses for the People, the stabbing took place in the ballroom while deceased was seated at a table under circumstances showing no provocation. The court had to decide between these two inconsistent and conflicting versions.

There is much in the record to support the testimony of the State's witnesses which, at the same time, discredits the testimony of the defendant and Douglas. Officer William McArdle testified that he found a fresh pool of blood under the table in the ballroom. This would be consistent only with the theory that the stabbing occurred there, since there was no proof whatever that deceased entered or was subsequently brought into the ballroom. Officer Matthew Ferguson testified that the defendant, at the time of his arrest, said that the fight took place in the ballroom after deceased had made remarks and had risen as though to come toward the table occupied by defendant and his wife.

On cross-examination, defendant, when confronted with his police statement which related that the stabbing took place in the ballroom, took refuge in the lame excuse that

he hadn't read the paper before he signed it. These, and other facts and circumstances, raised a serious doubt that defendant and Douglas were telling the truth. The court apparently rejected their testimony and was justified in doing so.

Since the evidence clearly proved that the defendant was guilty of the crime charged beyond a reasonable doubt and the trial was free from prejudicial error, the judgment of the criminal court of Cook County will be affirmed.

*Judgment affirmed.*