THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
LARRY JONES, Defendant-Appellant.

First District (5th Division)   No. 85—0018

Opinion filed May 1, 1987.

Dennis M. Doherty, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter Fischer, and Kay M. Ceresa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

On appeal from his rape conviction in a jury trial defendant Larry Jones contends: (1) the State did not prove him guilty beyond a reasonable doubt; (2) certain prosecutorial conduct deprived him of a fair trial; (3) defendant's statements to the police and prosecutors were improperly characterized as confessions; (4) the trial court erred in precluding cross-examination of the complaining witness concerning her place of residence at the time of trial; (5) the prosecution improperly exercised peremptory challenges to exclude all blacks from the jury.

We affirm in part and remand for a hearing on the prosecution's use of peremptory challenges.

The pertinent evidence at trial was as follows. The complaining witness, Wendy, testified that on October 30, 1983, she purchased a coffee table at a church rummage sale and was carrying it to the bus stop when the defendant, whom she had never seen before, approached and offered help. Wendy declined but defendant picked up the table anyway and carried it to the bus stop for her. Defendant offered her a ride home which she also declined. However, 10 minutes later defendant drove up, picked up the table and said "Let's

go." Wendy refused this offer but defendant carried the table to his car and tied it on the roof, with Wendy's help. They drove to Wendy's apartment, arriving at about 1:30 p.m. In their conversation they had exchanged names and defendant had told her he worked for the Chicago Housing Authority (CHA). Outside the apartment Wendy told defendant she could take it from there, but defendant carried the table upstairs to her second-floor apartment. Wendy waited for him to leave. When he did not do so, she offered to fix him a bowl of soup. He accepted and they both ate soup at her kitchen table.

Wendy received a phone call which she answered in another room. She returned to the kitchen to find defendant still there. She told him she had to meet a friend and he said he would leave. As Wendy led him to the front door he grabbed her and hugged her. Wendy stood back from him, patted his shoulder, and thanked him for his help. He then kissed her, and when she held up her hand to stop him he became very angry.

Trial evidence established that Wendy was five feet, four inches tall and weighed 125 to 130 pounds. Defendant was six feet, one inch tall and weighed 200 pounds. Defendant shouted at Wendy not to push him. She told him not to kiss her. Defendant told her that women "always say they don't want it when they do." When she started toward the front door, he pinned her against a closet and threatened her with a ceramic cup held three inches from her head, ordering her into the bedroom. He also threatened her with a coat-hanger hook held up to her face. Wendy initially convinced the defendant to talk more at the kitchen table. But he then said he was tired of talking, took a knife from a drawer, and dragged her by the hair into the bedroom with the knife held at her face. Wendy struggled with him but realized he was overpowering her and let him go. She continued to plead with him but he ultimately pushed her down on the bed, pulled her underclothes off, and had forcible sexual intercourse with her. In an attempt to dissuade him Wendy had expressed her fear of pregnancy. He told her she would not get pregnant. After the act he dangled a condom in front of her on the knife before discarding the condom in the bathroom. He told Wendy he was sorry and tried to kiss her. She told him no and told him to leave.

After the defendant left, Wendy called her church pastor and told him what had occurred. That pastor also testified at trial that Wendy, sobbing and distraught, told him that she had been attacked and raped by a man with a knife.

Wendy's male roommate returned during this conversation. He called another friend to whom she spoke for a few minutes. Wendy and her roommate talked and then called a rape hotline number and were told to call the police, which they did. By Wendy's estimate the call to the police was made 45 to 90 minutes after the attack. The police came and Wendy was taken to the hospital, where she was treated in the emergency room. Wendy gave defendant's name and description to the police and hospital personnel. She also told the police defendant worked for the CHA.

Several days later a man came to the apartment and left flowers for her with her roommate. (Defendant subsequently admitted at trial that he had brought these flowers.) Wendy reported this to the police. On November 19, 1983, as she was leaving her church she saw the defendant on the street. He called her name, asked if she had received the flowers, and told her he was sorry. Wendy gave him the name and number of a counselor that she had received from her pastor. (She testified that before defendant left her house after attacking her, he had asked for the number of a counselor.) Wendy then saw a friend approach. She left with the friend, called the police, and identified the defendant when they stopped him on the street.

Police testimony established that defendant's fingerprints were found on a glass from Wendy's home. On the day of his arrest defendant also made two oral statements to the police and an assistant State's Attorney. In those statements he gave essentially the same account as Wendy had concerning the event up to the moment when they shared the soup. Defendant then admitted that he threatened Wendy with a cup, forced her into the bedroom, and had forcible sexual intercourse with her. He subsequently brought flowers because he was sorry for what he had done. Assistant State's Attorney Lori Levin testified that she reduced defendant's statement to writing and read it to him. He said it was correct but refused to sign it.

Defendant presented the testimony of a hospital social worker who stated that his notes indicated that on the day of the incident Wendy described the defendant to him as an unknown male. Detective Carrie Orr of the Chicago police department testified that Wendy told him defendant worked for the CHA, but did not give him defendant's name. Another police officer testified that Wendy gave him defendant's first name but did not say he worked for the CHA.

Wendy's landlord at the time of the incident and the landlord's

fiancee testified that they were in the first-floor apartment from about 1 p.m. until 3:30 or 4 p.m., watching a football game on television. They left the apartment and returned at about 4:30 p.m. The landlord saw a "heavy built" black man enter the second-floor apartment at about 12:30 or 1 p.m., and the fiancee saw a "stocky built" black man leave at about 4:30 p.m. They heard nothing unusual from the second floor during the time they were downstairs.

The defendant, a CHA utility janitor, admitted having intercourse with Wendy but contended that it was consensual. He gave substantially the same account of their outside meeting as Wendy had. He testified that when he got up to leave after having the soup, Wendy kissed him. He kissed her several times but she then told him no. He asked her why she was enticing him and then continued to attempt to verbally persuade her to have sex with him. Finally she said he probably would not get his mind off it and invited him into the bedroom. They had consensual sexual intercourse during which he used a condom. Wendy told him that later she would give him the name of a person at her church to talk to concerning his obsession with sex. She also gave him her own telephone number, but he subsequently lost it. Several days later defendant brought Wendy flowers, leaving them with her roommate. Defendant denied ever admitting that he had forced sex on Wendy. He admitted to a prior theft conviction, but the State subsequently established that the conviction was for robbery.

OPINION

## 1

■ We find no merit to defendant's contention that the State failed to prove his guilt beyond a reasonable doubt. The testimony of the victim was corroborated by her prompt outcry to her pastor, fingerprint evidence placing defendant at the scene, and, most importantly, defendant's own pretrial statements admitting that he forced Wendy to have sex with him. In the face of this overwhelming evidence of guilt the jury was certainly not required to accept defendant's exculpatory trial testimony.

## 2

■ Defendant also contends that certain prosecutorial conduct during trial deprived him of a fair trial. Prior to trial defense counsel obtained a court ruling barring the State from eliciting from the complainant testimony that she moved out of her apartment because

she feared the defendant. During cross-examination of Wendy's land-lord, the prosecutor elicited from him the fact that Wendy moved out of the apartment. He then asked whether she moved out be-cause of "this incident." Defense counsel's objection to the question was sustained and the court instructed the jury to disregard it. The question clearly violated the spirit of the trial court's order and thus was improper. However, we find that the court's prompt action in sustaining the objection and instructing the jury to disregard cured the error. *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.

A second basis for defendant's claim of error arose when defendant's counsel was cross-examining a police officer about his conversation with the defendant in which defendant admitted having forcible sex with Wendy. The officer stated that he had several con-versations with the defendant after this one, with the second con-versation taking place a few months after the first one. When de-fense counsel again inquired about when the second conversation occurred, the officer stated, "The next one was when I arrested him for chasing \*\*\*." Defendant's counsel cut off the response with a motion to strike the remark, which the trial court granted. Prior to trial defendant had also been indicted for the offense of communicat-ing with a witness. (Ill. Rev. Stat. 1985, ch. 38, par. 32—4(b).) On defendant's motion the trial court quashed this indictment, finding that the grand jury testimony established only that on January 14, 1984 (2½ months after the incident in question here), defendant had chased Wendy for two blocks. The State subsequently agreed not to inquire at trial about this "subsequent charge." Defendant now claims that this truncated reference to that charge, elicited by de-fense counsel, was so prejudicial as to require a new trial. Given the trial court's action in striking this answer, and given the subsequent evidence that defendant had previously been convicted for robbery, we find no reversible error in this isolated reference to another ar-rest. See *People v. DuPree* (1979), 69 Ill. App. 3d 260, 387 N.E.2d 391.

Defendant also contends that it was improper for the prose-cution to suggest to the jury that the defendant was a liar. In par-ticular, defendant cites the prosecutor's argument that the jury should not believe defendant's testimony that Wendy gave him her telephone number after they had intercourse. Defendant contends the prosecution knew he had obtained Wendy's number because prior to trial the prosecution unsuccessfully sought leave to elicit Wendy's testimony that defendant telephoned her a few days after the rape. However, the prosecutor's argument to the jury concerned

defendant's claim that Wendy gave him her telephone number. Certainly defendant could have obtained the number from other sources. Thus we find no contradiction between the prosecution's pretrial and trial arguments on this question. A prosecutor may suggest to a jury that a witness is a liar when that suggestion is based on the evidence or on reasonable inferences drawn from that evidence. *People v. Ramey* (1979), 70 Ill. App. 3d 327, 388 N.E.2d 196.

Here, although defendant testified at trial that Wendy gave him her telephone number, he claimed to have lost it. Wendy testified only that she told defendant to contact her at her church for the name of a counselor. Certainly the jury could reasonably infer from Wendy's testimony concerning defendant's actions toward her that defendant was lying when he testified that Wendy gave him her home telephone number. Thus we find that the prosecutor's comments were based on reasonable inferences from the record.

■■ Over a defense objection as to relevancy, the prosecutor was permitted to elicit from Assistant State's Attorney Levin the fact that her function as a member of the Felony Review Unit at the time she took defendant's statement was to "determine whether or not the individual should be charged, and if the felony should be charged [to] determine which felon [*sic*] we should charge." Defendant correctly notes that this court has found it to be reversible error for a prosecutor to testify that he recommended that charges be placed against a defendant after discussing the facts of the case with the police (*People v. Blissitt* (1973), 12 Ill. App. 3d 551, 299 N.E.2d 562) or with other witnesses, including the defendant (*People v. Turner* (1984), 127 Ill. App. 3d 784, 469 N.E.2d 368). But the State presented no such specific testimony here. Ms. Levin's description of her duties was presented as background information. Indeed as we have noted, defense counsel contemporaneously objected only to the relevancy of this information. There was no evidence that Ms. Levin ever recommended charging the defendant with anything. Thus, although the testimony should have not been permitted, we find no reversible error in its introduction. See *People v. Mackins* (1974), 17 Ill. App. 3d 24, 308 N.E.2d 92.

3

■■ We find no merit to defendant's contention that the prosecution should not have referred to his incriminating statements as confessions. Defendant told the police and a prosecutor that he threatened Wendy with violence and then forcibly had sexual intercourse with her. Unlike the statement in *People v. Sowell* (1965), 56 Ill.

App. 2d 110, 205 N.E.2d 487, cited by defendant, nothing in the statements suggested a possible defense to the crime charged. Defendant's statements, although differing in some details from Wendy's account, constituted comprehensive admissions of guilt and thus were properly termed confessions by the prosecutor. *People v. Rollins* (1970), 119 Ill. App. 2d 116, 255 N.E.2d 471.

### 4

We next consider defendant's contention that the trial court erred in precluding defense counsel from eliciting Wendy's new address on cross-examination of her at trial. It would appear from the record that after the occurrence at issue Wendy moved out of her apartment. Prior to trial defense counsel sought a court order requiring the State to disclose her new address. The court denied this request, citing, *inter alia*, the grand jury testimony that defendant had chased Wendy down the street several months after the occurrence. However, the court did order that Wendy be made available for defense counsel to interview.

Defendant relies primarily on *Smith v. Illinois* (1968), 390 U.S. 129, 19 L. Ed. 2d 956, 88 S. Ct. 748. There defendant's conviction for the illegal sale of narcotics depended on the credibility of the State's witness, who claimed to have purchased the narcotics from the defendant. On cross-examination the State witness admitted he had identified himself with a false name on direct examination. However, the court then precluded defense counsel from eliciting his real name or his present address. Under these circumstances the court held that this interference with cross-examination of the witness deprived the defendant of his sixth amendment right to confront the witnesses against him. In a concurring opinion, Justice White stated his view that the majority opinion did not preclude a trial judge from exercising his discretion to determine whether such a normally permissible cross-examination question should not be permitted. (390 U.S. 129, 133-34, 135, 19 L. Ed. 2d 956, 960, 961, 88 S. Ct. 748, 751, 751-52.) Subsequent decisions have also construed *Smith* in such a manner. *United States v. Varelli* (7th Cir. 1969), 407 F.2d 735, 750 (no absolute right to exact address of witness if safety of witness is in doubt); *United States v. Spector* (8th Cir. 1986), 793 F.2d 932, 937-38; see *People v. Lipscomb* (1974), 19 Ill. App. 3d 114, 311 N.E.2d 257.

■ In this cause the trial court was aware of evidence that after the occurrence at issue the defendant had visited the complainant's home and had chased her down the street. Under these cir-

cumstances the trial court did not abuse its discretion in barring cross-examination of the complainant concerning her new home address.

5

Finally we consider defendant's contention that the prosecution improperly exercised peremptory challenges to exclude all blacks from the jury. It is clear from the record that the prosecution utilized some of its peremptory challenges to exclude blacks and it is also clear that no blacks served on the jury. Defense counsel contended that blacks were being excluded solely because of their race. The prosecution, citing *People v. Payne* (1975), 99 Ill. 2d 135, 457 N.E.2d 1202, contended that they were not required to explain their use of peremptory challenges. The trial court noted that although it appeared that some prospective jurors were excused solely because of their race, the law then in effect did not afford defendant a remedy.

During the pendency of this appeal the United States Supreme Court has held that if a defendant in a State criminal trial makes a *prima facie* showing that the prosecution has used peremptory challenges to strike members of the defendant's race from the jury venire solely because of their race, the prosecution has the burden of providing a neutral explanation for those challenges. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712.) *Batson* has been held to be applicable to cases pending on direct review at the time it was issued. (*Griffith v. Kentucky* (1987), 479 U.S. ___, 93 L. Ed. 2d 649, 107 S. Ct. 708.) Accordingly, we remand this case for a *Batson* hearing at which the defendant shall have the opportunity to make the requisite *prima facie* showing. If such a showing is made, and if the prosecution does not then provide a neutral explanation for the contested challenges, the trial court shall vacate the judgment of conviction and grant defendant a new trial. Otherwise the defendant's conviction and sentence shall stand.

Affirmed in part and remanded with directions.

SULLIVAN, P.J., and MURRAY, J., concur.