THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEX COOPER, Defendant-Appellant.

First District (6th Division)   No. 1—91—0820

Opinion filed March 26, 1993.

Michael J. Pelletier and Ann C. McCallister, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Joan F. Frazier, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

Following a jury trial, defendant Alex Cooper, also known as Alex Malone, was found guilty as accountable for armed violence and first degree murder of Sammy Hatcher, and was sentenced to 27 years in prison. Defendant raises the following issues on appeal: (1) involuntariness of post-arrest statements; (2) denial of his sixth amendment right to confrontation; (3) the trial court improperly allowed speculative testimony that defendant was a gang member; (4) improper prosecutorial comments during closing arguments; (5) the sentence was excessive; and (6) the judge erred in entering judgment and sentence on two counts of murder where only one victim was involved. (Codefendant Elbert Wright, the shooter in the incident, pled guilty prior to defendant's trial and also received a 27-year sentence.)

The record reveals the following facts. Lisa Nelson, a resident of 1161 North Larabee, Chicago, which is part of the Chicago Housing Authority Cabrini-Green project, testified on behalf of the State. On December 13, 1988, at around 4 p.m., she was walking into the build-

ing where she resided with her friend, Vernadeen Nelson (no relation). She saw three boys whispering in the lobby, whom she identified as defendant, Wright, and Tory Griffin. Defendant was 17 years old at the time. Lisa made an in-court identification of defendant and stated that she had seen him hundreds of times prior to that date. The women then went upstairs to Lisa's aunt's apartment.

Around 4:45 p.m., Lisa heard the sound of two or three gunshots while she was standing in the living room. She ran to the window which looked out onto the 1158 North Cleveland building of Cabrini-Green. Lisa saw Wright, Griffin and defendant enter the 1159 North Larabee building, which is connected to her building. Griffin wore a black and blue coat, Wright wore a long gray coat, and defendant wore a tan and brown coat. Lisa saw Wright shoot a gun from the building. Lisa knew Wright and Griffin by name. While Lisa had seen defendant on numerous occasions, she did not know his name until Vernadeen informed her that it was Alex Malone.

Following the shooting, the women called the police. The police arrived about 20 minutes later, and Lisa and Vernadeen spoke with them in the stairwell of the 1161 North Larabee building. The women also spoke with the police later that night. The following day, they met with the police at another location because they did not want anyone to see them speaking with the police. Later that evening, the officers drove the women to the station, where they identified defendant and Wright in a show-up.

The trial court conducted a *voir dire* examination of Lisa outside the jury's presence to determine whether to permit testimony concerning defendant's and Wright's alleged affiliation with the Black Gangster Disciples. Lisa stated that she had known Wright for two years and had seen him use gang signs with his hands, and that he wore his hat in a particular manner to indicate his affiliation with the Disciples. She indicated that the various buildings in Cabrini-Green were controlled by different gangs, and that the 1161 North Larabee building was controlled by the Disciples. She had seen defendant in the company of Disciple members on previous occasions and therefore assumed he was also a member of that gang. However, she had never seen defendant represent that he was a gang member. The trial judge ruled that he would permit testimony regarding defendant's and Wright's affiliation with the Disciples.

Vernadeen Nelson also testified for the State. She admitted that she uses other names, but declined to divulge those names because of threats she had received. Vernadeen testified that she was with Lisa in Lisa's aunt's apartment and that she heard two or three shots fired

around 4:45 p.m. She heard Lisa scream out and saw her looking out the window. She joined Lisa at the window and recognized defendant standing against the wall of the 1159 Larabee building. Defendant was "pressed up against the wall." She demonstrated that defendant stood with his body against the wall, with his hands at his side. Defendant wore a tan winter coat, which she had seen him wear on many previous occasions. The women notified the police, and Vernadeen supplied defendant's name as the third individual who was involved in the shooting.

On cross-examination, Vernadeen testified that the father of one of her children was also the boyfriend of defendant's sister, Sabrina Cooper, and that the two women had previously argued about the boyfriend. She admitted that she gave the police an incorrect address when she first spoke with them. During redirect examination, she stated that she did not give the police her correct address because she did not want to testify, as she had two small children and had been threatened on several occasions.

Officer Anthony Graffeo of the Chicago police department testified that after he spoke with Lisa following the shooting, he proceeded to 624 Division in Cabrini-Green to the residence of Wright's grandmother. Graffeo recovered a long gray coat at that location. Next, Graffeo went to Griffin's residence, but he was unable to locate him. Finally, Graffeo proceeded to defendant's residence, and defendant's mother informed him that defendant was at work.

Graffeo went to defendant's place of employment and spoke with him. He told defendant that he was a police officer and that he was investigating a murder that occurred the previous night in Cabrini-Green. Defendant voluntarily agreed to accompany Graffeo to the police station. After arriving at the police station, defendant was placed in an interview room. Defendant was not handcuffed, and the door to the interview room was not locked. Later that day, defendant's mother came to the station. Graffeo told her that defendant was assisting in the investigation of the Cabrini-Green shooting. Graffeo stated that defendant's mother did not ask to speak with him, nor did he ask to see his mother.

Detective Thomas Blomstrand testified that on the day of the shooting he was assigned to investigate it. Together with his partner, Michael Wick, Blomstrand headed toward 1159-1161 North Cleveland Street. En route to their destination, they received a radio message and drove instead to 1161 North Larabee. As he drove up to the building in an unmarked squad car, he saw two men standing in front of the doorway at an entrance to the building. Blomstrand identified

Wright as one of the men. Both men ran into the building upon seeing the officers approach.

The officers left their cars and chased the men into the building, but were unable to find them. Thereafter, the officers spoke with Lisa and Vernadeen in the third-floor hallway. Following that conversation, the officers began their search for Wright, Griffin and defendant. At the crime scene, the officers saw a pool of blood on top of a ramp leading into the building and recovered four cartridge casings from a .380 automatic near the body, as well as a .22 cartridge casing.

Assistant State's Attorney Adriane Mebane testified that on December 14, 1988, at approximately 10:15 p.m., she spoke with Detectives Blomstrand and Wick at Area 6 headquarters and learned that defendant and Wright were in custody. Defendant's sisters were also present at the police station speaking with him. Mebane left the station and was summoned to return around 4:30 a.m. Mebane apprised defendant of his *Miranda* rights, and he agreed to give a statement. Defendant read the statement and made a number of corrections. At the conclusion of the statement, defendant indicated that he was making the statement voluntarily; that he had not been threatened nor had anyone made any promises to him to make the statement; and that he had been given something to eat and drink.

In defendant's statement, he indicated that on December 13, 1988, around 4:42 p.m., he was in the lobby of the apartment building located at 1161 North Larabee accompanied by Wright, age 14, Demetrius West, Antoine Griffin, and Tory Griffin. Wright pulled out a .22-caliber gun, showed it to the others, and said "[L]et's get into something." Defendant construed Wright's statement to mean that he wanted to shoot a member of the King Cobra street gang. Defendant told Wright that he was ready and that he "was with it," by which he meant that he would watch out for the police.

Defendant, Wright, and Tory Griffin left the building. Tory Griffin remained on the street as a look-out, while defendant and Wright walked to 1158 North Cleveland considered to be King Cobra territory. As Wright and defendant entered the building, a man who was a member of the King Cobras walked up the ramp. From a distance of approximately 12 feet away, Wright fired at the man's head. The victim uttered an exclamation, clenched his head and fell to the ground. Wright then walked another six feet closer to the victim and fired a second shot. Defendant and Wright ran back to 1159 North Larabee, where they met with West, and the Griffins. Wright told them how the shooting had occurred. The group then scattered, and defendant

returned home. Defendant admitted that he and Wright were members of the Disciples gang.

The parties stipulated that at the scene of the shooting, police found seven .380 automatic cartridge casings, and one .22-caliber cartridge casing. The parties further stipulated that the bullet and bullet fragment removed during the autopsy of the deceased were from a .22-caliber weapon.

Defendant's sisters, Sabrina Cooper and Bernestene Malone, testified on his behalf. Cooper testified that on December 14, 1988, she was in the house when the police entered and arrested her brother. She stated that she spoke with her brother at the police station later that day and that he was handcuffed to the wall. Malone similarly testified that when she spoke with her brother, he was handcuffed to the wall.

Defendant's mother, Isabelle Malone Cooper, also testified on his behalf. On December 14, 1988, she had gotten off work around 10 a.m. from her position as a crossing guard for the Chicago police department. Two police officers came to her apartment looking for defendant. She told the officers that defendant was at work. When she finished her shift around 3:30 p.m., she went to the police station dressed in her uniform. She saw defendant's name on the door of an interview room and asked the police whether she could speak with her son. The police refused her request. Two hours later, she attempted to speak with her son, but the police officers again denied her request. Cooper stated that she asked to speak with defendant approximately three or four times during the six hours she spent at the police station. When she did see defendant in the interview room, he was handcuffed to the wall.

At trial, defendant testified that he did not shoot the deceased on December 13, 1988, nor did he act as a look-out on behalf of the others. Defendant testified that around 3 p.m., on the day of the incident, he was outside of the building at 714 West Division and that he met some friends, including Demetrius West, Antoine Griffin, and Tory Griffin. Wright then approached the group and pulled out a gun. Defendant did not believe that the gun was real; however, Wright opened the barrel and showed him some bullets.

Wright placed the gun inside his coat and walked toward the 1159 North Larabee building, while defendant and his friends followed. Wright, Tory Griffin, and an individual named Walter Johnson then split off and walked towards the 1158 North Cleveland building. Defendant saw Wright and Johnson enter the building, while Tory Griffin remained in the street. Defendant was in the lobby of the 1159

North Larabee building with West and Antoine Griffin when he heard a gunshot. He looked out and saw Wright, Tory Griffin and Johnson running from the 1158 North Cleveland building back toward the 1159 North Larabee building. Wright then entered the building and told the group that he had just shot someone. Shortly thereafter, defendant left the group and went home.

The following day, defendant was picked up at his place of employment by the police. Defendant denied any involvement in the shooting incident during the first few police interviews. He fell asleep several times, but the police continually awakened him. Finally he told the police that he was involved in the incident. He gave the officers a statement; however, they did not first inform him of his *Miranda* rights. Defendant further denied the veracity of the statement which he gave to the court reporter. He stated that the officers did not strike him during the course of the investigation; rather, he only confessed because he was scared. According to defendant, there was no writing on the confession when he signed it. He denied that he signed each page of the statement or initialed it.

Joseph Szybist, a court reporter, testified for defendant that he recorded verbatim what was said during the session and that the transcript was in the same condition as when he originally produced it. Szybist further testified that he recalled hearing Mebane advise defendant of his *Miranda* rights and that she asked defendant how he had been treated by the police.

During the State's rebuttal case, Detective Blomstrand again testified that neither he nor Detective Wick threatened defendant. Blomstrand arrested defendant around 6:15 p.m. on December 14, 1988, after defendant told him that he was present when the deceased was shot to death. Defendant stated that he acted as a look-out when the shooting occurred. Later that evening defendant denied any involvement in the murder; however, he again stated around 2:30 a.m. that he acted as a look-out. After apprising defendant of his *Miranda* rights, he recorded the conversation on a general progress report which defendant signed.

The jury found defendant guilty of first degree murder. The following individuals testified on behalf of defendant at the sentencing hearing. Defendant's friend, Ronald Fisher, testified to defendant's community involvement in a tutoring program and positive interaction with children. Defendant's father testified that defendant had possibilities for employment upon his release from prison through his labor union. Defendant's mother also testified that he had never been in trouble prior to this incident. Defense counsel argued that Wright, the

shooter in this incident, received a 27-year sentence of imprisonment. He asked the court not to give defendant a longer sentence than that which was imposed upon the person who was primarily responsible for the murder. After hearing the mitigating evidence, the judge imposed a sentence of 27 years upon defendant.

On appeal, defendant first asserts that his post-arrest statements were involuntary because he was only 17 years old, had no prior involvement with the criminal justice system, and was detained and questioned over 20 hours without contact with his mother, or allowed adequate food or the opportunity to sleep.

Prior to trial, defendant filed a motion to suppress statements and quash arrest. The trial court heard the testimony of Detectives Blomstrand and Wick, Assistant State's Attorney Mebane, and defendant's mother. The judge noted the absence of any testimony of verbal or physical threats or physical touching of the defendant during the course of the interrogation. The judge also noted that defendant first indicated his participation in the offense around 6:15 p.m., approximately five hours after he had been taken into custody, which therefore justified the police further detaining defendant. At the end of the statement given to assistant State's Attorney Mebane, defendant indicated that he was making the statement voluntarily; that he had not been threatened nor had anyone made any promises to him to induce him to make the statement; and that he had been given something to eat and drink and had been allowed to use the rest room.

Whether a statement is voluntarily given depends on the totality of the circumstances. (*People v. Sledge* (1989), 183 Ill. App. 3d 1035, 539 N.E.2d 1312; *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228.) Factors to consider when making a determination of voluntariness include the age, education and intelligence of the accused, the length of the detention and the duration of the questioning, whether the accused was advised of his constitutional rights, and whether the accused was subjected to any physical mistreatment. (*People v. House* (1990), 141 Ill. 2d 323, 566 N.E.2d 259; *People v. Terrell* (1989), 132 Ill. 2d 178, 547 N.E.2d 145; *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228.) The test is whether it has been made freely, voluntarily, and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228.) The question of the competency of a confession is for the trial court alone to decide by a preponderance of the evidence, and its findings will not be disturbed by a court of review unless they are against the manifest weight of the evidence. *People v. Redd* (1990), 135 Ill. 2d 252, 553 N.E.2d 316.

■■ Application of the totality of the circumstances standard to the present case supports the trial court's conclusion that defendant was not physically or psychologically coerced into making the post-arrest statements. After the police had spoken with Lisa and Vernadeen Nelson, who implicated defendant in the murder, the police went to his place of employment around 11 a.m. The record indicates that defendant voluntarily accompanied the officers to the police station for questioning. Officer Graffeo testified that after defendant arrived at the police station, he was not handcuffed, and the door to the interview room was not locked. Defendant was not handcuffed until he gave the officers an inculpatory statement at 6:15 p.m. While defendant did deny those statements shortly thereafter, it was proper for the police to pursue a rigorous investigation because of other corroborating evidence discovered later that evening.

We also find that defendant was adequately informed of his rights throughout the course of the interrogations. Detective Blomstrand testified that he continually informed defendant of his *Miranda* rights. Assistant State's Attorney Mebane also indicated that she apprised defendant of his *Miranda* rights and that defendant agreed to give a statement. The court reporter also testified that he recalled hearing Mebane advise defendant of his *Miranda* rights and inquire as to how he had been treated. Too, the record is devoid of any suggestion that defendant did not understand the *Miranda* warnings.

While it is true that defendant was only 17 years old at the time of the incident and did not speak with his mother, we do not find those factors sufficient to overcome the voluntariness of defendant's post-arrest statements. Defendant was allowed to speak with his sisters for approximately 25 minutes. The record also does not indicate that defendant actually requested to speak with his mother. Defendant had previously been arrested on a weapons charge; thus, he had some exposure to the criminal justice system.

For the reasons stated above, we find that the trial court's denial of defendant's motion to suppress statements was not against the manifest weight of the evidence.

Defendant next asserts that he was denied his sixth amendment right to confront witnesses when the trial court sustained questions posed to Vernadeen Nelson during cross-examination concerning aliases she might have used. At trial, the State asked Vernadeen during direct examination whether she used any other names. She declined to answer that inquiry. During the side bar conducted outside the presence of the jury, the prosecutor indicated that it was his understanding that Vernadeen was known as "Ms. Nelson" and "Ms. Corn-

gay," and that he wanted to draw the potential sting of such duplicity during direct examination. Vernadeen stated that she did not wish to reveal other names she had used because she had been threatened.

During cross-examination, Vernadeen stated that when she first spoke with the police, she did not give them her correct address. Defense counsel also inquired as to the name set forth on her birth certificate. In a side bar, defense counsel informed the court that he needed to know the witness' correct name in order to determine if she had a criminal record. The trial court stated that counsel should have determined that matter before the witness testified, and that she could be recalled in the event that she had a criminal record. The court then sustained the State's objection to the question.

Defendant states that pursuant to Supreme Court Rule 412 (134 Ill. 2d R. 412), the State shall disclose to defense counsel the names and last known addresses of persons whom the State intends to call as witnesses. During discovery, defendant requested the names and addresses of both Vernadeen and Lisa. The State attempted to locate Vernadeen at the Gary, Indiana, address she had given; however, upon further investigation, it proved to be a vacant building. The day before trial commenced, defendant moved to strike "Bernadeen Nelson" as a witness because the State had not yet tendered her address. The court denied the motion, finding that the State had only been able to locate Vernadeen shortly before trial.

As support for his position, defendant relies upon *Smith v. Illinois* (1968), 390 U.S. 129, 19 L. Ed. 2d 956, 88 S. Ct. 748. In that case, the principal witness for the State, an informer, admitted on cross-examination that the name he had first given was false. The trial court sustained the State's objections to questions on cross-examination as to the witness' correct name and where he resided. The Court held that a defendant in a State criminal trial is deprived of the right to confront the witnesses against him as guaranteed by the sixth amendment where he is denied the right to ask a witness questions as to his name or where he lived. The Court reasoned:

> "Yet when the credibility of a witness is in issue, the very starting point in 'exposing falsehood and bringing out the truth' through cross-examination must necessarily be to ask the witness who he is and where he lives. The witness' name and address open countless avenues of in-court examination and out-of-court investigation. To forbid this most rudimentary inquiry at the threshold is effectively to emasculate the right of cross-examination itself." *Smith v. Illinois*, 390 U.S. at 131, 19 L. Ed. 2d at 959, 88 S. Ct. at 750, quoting *Pointer v. Texas*

(1965), 380 U.S. 400, 404, 13 L. Ed. 2d 923, 926, 85 S. Ct. 1065, 1068.

The Supreme Court acknowledged that the extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court. However, no obligation is imposed on the court to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self-incrimination, properly invoked.

The State argues that the *Smith* decision has been subsequently construed to circumscribe this right when the witness' personal safety is in jeopardy. (*United States v. Varelli* (7th Cir. 1969), 407 F.2d 735, 750 (no absolute right to exact address of witness if safety of witness is in doubt); *People v. Jones* (1987), 155 Ill. App. 3d 641, 508 N.E.2d 357 (no abuse in barring cross-examination of complainant concerning her new home address, given its awareness of evidence that after occurrence at issue defendant had visited complainant's home and chased her down the street).) However, we note that in each of the aforementioned cases, it is the witness' address, not his or her identity, which is at issue.

█ In the present case, the trial judge was placed in the difficult position of balancing the potential harm to the witness in view of the threats she had received, against defendant's absolute right to confrontation. The preferable course of action would have been for the trial judge to clarify the names which Vernadeen had used and to ascertain whether she had a criminal record. The trial judge has discretion to question witnesses in order to elicit the truth or clarify material issues which seem obscure. *People v. Wesley* (1959), 18 Ill. 2d 138, 163 N.E.2d 500; *People v. Brown* (1990), 200 Ill. App. 3d 566, 558 N.E.2d 309.

However, we find an error of this magnitude is harmless under the circumstances in light of the considerable evidence amassed against defendant. Lisa testified to substantially the same facts as those testified to by Vernadeen, with the exception of Vernadeen's statement that she saw defendant "pressed up against the wall." In several aspects, Vernadeen's testimony was merely cumulative to the testimony rendered by Lisa. Most importantly, in defendant's own statement he admits that he was in the lobby of the 1161 North Larabee building accompanied by Wright, West, and the Griffins. After Wright showed him the .22-caliber gun, he told him that he "was with it," manifesting his intent to participate in the murder. In light of the circumstances in this case, we believe that the ruling of the trial court

sustaining the State's objections to the questions concerning the witness' name and address was harmless beyond a reasonable doubt.

Defendant next asserts that the trial court improperly allowed speculative opinion testimony that defendant was a member of the Disciples. Specifically, defendant complains that Lisa Nelson was permitted to testify, without foundation, that defendant and Wright were members of the same gang even though she had never seen him represent his membership in that gang. Defendant maintains that the introduction of such improper opinion testimony was extremely prejudicial to him.

■ Upon review of the record, we find that the trial court's actions were appropriate in this case. The trial judge conducted a *voir dire* examination of Lisa outside the jury's presence and asked her whether residents of Cabrini-Green know which individuals are members of the various gangs. When Lisa indicated that it is common knowledge among the residents, the trial judge concurred with her assessment and concluded that if you live in this area, you do not need to be an expert to testify on this issue. Lisa testified that based upon the fact that she had seen defendant in the company of Wright, a known member of the Disciples gang, on numerous occasions, she assumed that he was a also a member of that gang.

We find Lisa Nelson's testimony about defendant's gang membership was appropriate in this case, especially when we consider that in his court-reported statement, defendant admitted that he was a member of the Disciples.

Defendant further contends that the State's closing argument denied his right to due process of law because it unfairly bolstered the testimony of Vernadeen and Lisa by arguing that these two witnesses risked their lives in order to testify.

■ At the outset, we note that prosecutors are afforded wide latitude in closing argument, and improper remarks will not merit reversal unless they result in substantial prejudice to the defendant (*People v. Pittman* (1982), 93 Ill. 2d 169, 442 N.E.2d 836), considering the context of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial. (*People v. Bryant* (1983), 94 Ill. 2d 514, 447 N.E.2d 301.) Vernadeen's and Lisa's apprehension of testifying for fear of their safety has been made part of the record, and as such, the State could comment upon this evidence and draw all legitimate inferences therefrom. *People v. Thompkins* (1988), 121 Ill. 2d 401, 521 N.E.2d 38.

■ Defendant further assigns as error the comments made by the State during closing argument which aroused sympathy for the

deceased, and thereby encouraged the jurors to minimize the importance of the rights of the accused. However, defendant's failure to include this issue in his post-trial motion results in waiver upon review. *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.

Relatedly, defendant argues that the State pandered to the jury's fears concerning gang-related violence by urging the jury to "send a message" to defendant and to various gangs in Cabrini-Green in order to protect the rights of others. We reject defendant's contention, for it is entirely proper for the prosecutor to dwell upon the evil results of crime and to urge the fearless administration of the law. *People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357; *People v. Batson* (1992), 225 Ill. App. 3d 157, 587 N.E.2d 549.

Defendant next posits that defendant's sentence of 27 years for murder was excessive in light of his limited involvement in the offense, his youth and his lack of any significant criminal background, and the mitigating factors as testified to by defendant's parents and friend.

■ The determination of the appropriate sentence to impose in a given case is a matter within the sound discretion of the trial judge, and his decision will not be overturned absent an abuse of that discretion. (*People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998.) After careful review of the record, we will not disturb the imposition of sentence, especially in light of the fact that Wright pled guilty to this offense and received a 27-year sentence of imprisonment. We also note that the court's sentence was well within the statutory range of not less than 20 years nor more than 60 years for first degree murder. Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(1).

■ Finally, defendant contends that where only one person was killed, the trial court erred in entering judgment and sentence on two counts of murder. However, the record reveals that at sentencing, the imposition of the 27-year sentence was based upon defendant's conduct in acting as a look-out during the murder of the deceased. Therefore, there is no need for resentencing on this issue. Nonetheless, as the State concedes, the judgment order should be corrected to reflect only one conviction for murder.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed as modified with respect to the judgment order.

Affirmed as modified.

EGAN and RAKOWSKI, JJ., concur.